UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| WAGNER SPRAY TECH CORP., : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> UNITED STATES, : <br> : <br> Defendant. : <br> : | Court No. 23-00241 |

**COMPLAINT**

Plaintiff Wagner Spray Tech Corp. ('Wagner"), by and through undersigned counsel, hereby allege and state as follows:

**ADMINISTRATIVE DECISION TO BE REVIEWED**

1. Plaintiff contests the October 17, 2023, Final Scope Ruling issued by the U.S. Department of Commerce ("Commerce"), finding that Wagner's finished heat sink manifolds are within the scope of the antidumping duty ("AD") and countervailing duty ("CVD") orders on Aluminum Extrusions from the People's Republic of China. See Commerce Memorandum, "Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on Wagner Finished Heat Sink Manifold" (A-570-976, C-570-968) (October. 17, 2023) ("Final Scope Ruling").

**JURISDICTION**

2. The Court of International Trade has jurisdiction over Wagner's action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c).

## STANDING OF PLAINTIFF

3. Plaintiff is the U.S. importer of the finished heat sink manifold subject to the contested determination, and Wagner requested and participated in Commerce's scope inquiry that resulted in the contested determination. Plaintiff therefore is a party to the proceeding and is entitled to commence this civil action pursuant to 28 U.S.C. § 2631(c) and 19 U.S.C. § 1516a(a)(2)(B)(vi) and (d).

## TIMELINESS OF THE ACTION

4. On October 17, 2023, Commerce issued the Final Scope Ruling through its Antidumping Duty and Countervailing Duty Centralized Electronic Service System ("ACCESS") and issued the Final Scope Ruling by mail to counsel of record the same day. The thirtieth calendar day after October 17, 2023, falls on November 17, 2023. Consequently, Plaintiff timely filed its Summons within the deadline set by 19 U.S.C. § 1516a(a)(2)(A)(ii) on November 17, 2023 (i.e., within 30 days after the date of mailing of a determination under 19 U.S.C. § 516a(a)(2)(B)(vi)).

5. The thirtieth calendar day after November 17, 2023, falls on December 17, 2023, a Sunday, with Monday December 18, 2023, being the next business day. Plaintiff is therefore timely filing this Complaint within the deadline set by 19 U.S.C. § 1516a(a)(2)(A)(ii) and Rule 3(a)(2) of the Court (i.e., within 30 days after the filing of the Summons).

## BACKGROUND

4. On May 26, 2011, Commerce issued AD/CVD orders on aluminum extrusions from China. *Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (May 26, 2011); and *Aluminum Extrusions from the People's Republic of*

*China: Countervailing Duty Order,* 76 Fed. Reg. 30,653 (May 26, 2011) (collectively, the Orders).

5. The scope of the Orders is as follows:

> The merchandise covered by the order is aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents). Specifically, the subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 1 contains not less than 99 percent aluminum by weight. The subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 3 contains manganese as the major alloying element, with manganese accounting for not more than 3.0 percent of total materials by weight. The subject merchandise is made from an aluminum alloy with an Aluminum Association series designation commencing with the number 6 contains magnesium and silicon as the major alloying elements, with magnesium accounting for at least 0.1 percent but not more than 2.0 percent of total materials by weight, and silicon accounting for at least 0.1 percent but not more than 3.0 percent of total materials by weight. The subject aluminum extrusions are properly identified by a four-digit alloy series without either a decimal point or leading letter. Illustrative examples from among the approximately 160 registered alloys that may characterize the subject merchandise are as follows: 1350, 3003, and 6060.
>
> Aluminum extrusions are produced and imported in a wide variety of shapes and forms, including, but not limited to, hollow profiles, other solid profiles, pipes, tubes, bars, and rods. Aluminum extrusions that are drawn subsequent to extrusion (drawn aluminum) are also included in the scope.
>
> Aluminum extrusions are produced and imported with a variety of finishes (both coatings and surface treatments), and types of fabrication. The types of coatings and treatments applied to subject aluminum extrusions include, but are not limited to, extrusions that are mill finished (i.e., without any coating or further finishing), brushed, buffed, polished, anodized (including brightdip anodized), liquid painted, or powder coated. Aluminum extrusions may also be fabricated, i.e., prepared for assembly. Such operations would include, but are not limited to, extrusions that are cut-to-length, machined, drilled, punched, notched, bent, stretched, knurled, swedged, mitered, chamfered, threaded, and spun. The subject merchandise includes aluminum extrusions that are finished (coated, painted, etc.), fabricated, or any combination thereof.
>
> Subject aluminum extrusions may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, window frames, door frames, solar panels, curtain walls, or furniture. Such parts that otherwise meet the definition of aluminum extrusions are included

in the scope. The scope includes the aluminum extrusion components that are attached (e.g., by welding or fasteners) to form subassemblies, i.e., partially assembled merchandise unless imported as part of the finished goods 'kit' defined further below. The scope does not include the non-aluminum extrusion components of subassemblies or subject kits.

Subject extrusions may be identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or heat sinks (that do not meet the finished heat sink exclusionary language below). Such goods are subject merchandise if they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation.

The following aluminum extrusion products are excluded: aluminum extrusions made from aluminum alloy with an Aluminum Association series designations commencing with the number 2 and containing in excess of 1.5 percent copper by weight; aluminum extrusions made from aluminum alloy with an Aluminum Association series designation commencing with the number 5 and containing in excess of 1.0 percent magnesium by weight; and aluminum extrusions made from aluminum alloy with an Aluminum Association series designation commencing with the number 7 and containing in excess of 2.0 percent zinc by weight.

The scope also excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels. The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the order merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product.

The scope also excludes aluminum alloy sheet or plates produced by other than the extrusion process, such as aluminum products produced by a method of casting. Cast aluminum products are properly identified by four digits with a decimal point between the third and fourth digit. A letter may also precede the four digits. The following Aluminum Association designations are representative of aluminum alloys for casting: 208.0, 295.0, 308.0, 355.0, C355.0, 356.0, A356.0, A357.0, 360.0, 366.0, 380.0, A380.0, 413.0, 443.0, 514.0, 518.1, and 712.0. The scope also excludes pure, unwrought aluminum in any form.

The scope also excludes collapsible tubular containers composed of metallic elements corresponding to alloy code 1080A as designated by the Aluminum Association where the tubular container (excluding the nozzle) meets each of the following dimensional characteristics: (1) length of 37 millimeters ("mm") or 62 mm, (2) outer diameter of 11.0 mm or 12.7 mm, and (3) wall thickness not exceeding 0.13 mm.

> **Also excluded from the scope of this order are finished heat sinks. Finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements.**
>
> Also excluded from the scope of the order is certain rectangular wire produced from continuously cast rolled aluminum wire rod, which is subsequently extruded to dimension to form rectangular wire. The product is made from aluminum alloy grade 1070 or 1370, with no recycled metal content allowed. The dimensions of the wire are 5 mm (+/- 0.05 mm) in width and 1.0 mm (+/- 0.02 mm) in thickness. Imports of rectangular wire are provided for under HTSUS category 7605.19.000.

Id. (emphasis added).

6.  In May 2011, the U.S. International Trade Commission ("ITC") issued its Final Report supporting its finding of material injury to the U.S. industry. *Certain Aluminum Extrusions from China*, Investigation Nos. 701-TA-475 and 731-TA-1177 (Final), Pub. 4229 at 1 (May 2011). In that report, the ITC found finished heat sinks ("FHS") to be a separate like product not causing injury to the U.S. industry. This no injury finding precipitated the exclusion in the Orders.

7.  The ITC described FHS as follows:

> { finished heat sinks ("FHS")} are not different from other aluminum extrusions in terms of their metallurgic chemistry, or by virtue of being further fabricated or produced in custom shapes. FHS are different from most other aluminum extrusions, however, by virtue of the specific and precise tolerances to which they are generally produced. FHS are designed to remove damaging heat from electronic equipment. The flat surface tolerance for FHS is often 1/1000 of an inch per inch, compared to 4/1000 to 14/1000 of an inch per inch for ordinary aluminum extrusions. The precise flatness of FHS allows for close contact between the FHS and the heat-generating components for which they have been designed and to which they are attached, thereby reducing or eliminating heat-trapping "dead air."
>
> FHS also differ from other aluminum extrusions (including heat sinks that are not "finished") because of their customized thermal resistance properties. Whereas most aluminum extrusions are differentiated by shape and dimension, FHS are also characterized by their thermal resistance properties. In fact, FHS are certified to perform within thermal resistance parameters. Although these thermal resistance properties are not visible, they are clearly relevant to the customers for whom FHS have been designed. They make FHS precisely or optimally suited to cool the specific electronic devices for which they have been designed. . . .

> FHS are produced from aluminum extrusions in a process in which a cut part of an extrusion is held in and fabricated by a computer controlled milling machine to add holes, clearance pockets, and attachment points for heat generating devices. The machined part is typically cleaned and deburred, and it can have one of a variety of finishes applied to it. Specialized equipment, including wind tunnels, flow calibration equipment, testing equipment, and specialized design and data collection software, are used to design FHS and to produce prototypes. Highly trained employees manage the FHS design and testing equipment. Substantial thermal analysis and testing are associated with the front end of FHS production.

Id. at 7-8.

8. On November 21, 2022, Wagner filed a Scope Ruling Application with Commerce seeking to determine whether Wagner's finished heat sink manifold (part no. 805-324) fell within the finished heat sink exclusion under the Orders.

9. In its Scope Ruling Application, Wagner explained that "the 805-324 manifold is custom designed for use exclusively in Wagner's Titan 440 line of paint sprayers" and that the " manifold functions with two main purposes -controlling the flow of liquid paint and heat dissipation to maintain acceptable temperature of the pump and motor." Further, Wagner explained that "The finished heat sink manifolds are produced using Chinese- origin Series 6 aluminum alloy that is extruded into blanks and then precision machined to custom dimensions, flatness and quality to achieve the desired specifications for heat dissipation."

10. Throughout the Scope Ruling Application, Wagner demonstrated 1) how the design and production of the heat sink manifold was organized around specific thermal requirements; and 2) how the product was fully tested to meet those thermal requirements. Scope Ruling Application at 9-23.

11. On December 22, 2022, Commerce initiated a scope inquiry into Wagner's finished heat sink manifold. *See* Memorandum, "Initiation of Wagner Spray Tech Corporation (Wanger) Heat Sink Manifold Scope Inquiry," (December 22, 2022).

12. On January 30, 2023, the domestic interested party filed comments on Wagner's Scope Ruling Request opposing Wagner's position that the heat sink manifold falls within the FHS exclusion.

13. On February 21, 2023, Wagner filed rebuttal comments in response to the domestic interested party's comments.

14. On August 24, 2023, Commerce issued a supplemental questionnaire to Wagner to which Wagner responded on September 11, 2023. In this supplemental response, Wagner provided additional details and documentation explaining how the heat sink manifold was designed, organized and tested around specific thermal requirements. These requirements included temperature parameters outlined UL 746C, which is included within the UL 1450 standard.

15. On September 25, 2023, the domestic interested party submitted comments on Wagner's Supplemental Response and on October 11, 2023, Wagner submitted rebuttal comments in response to the domestic interested party's comments.

16. On October 17, 2023, Commerce issued its Final Scope Ruling finding that Wagner's finished heat sink manifold did not meet the requirements of the FHS exclusion in the Orders.

17. Commerce concluded that to meet the finished heat sink exclusion, a product must meet the following five criteria:

> (1) the product must be a "fabricated heat sink made from aluminum extrusions;" (2) specified thermal performance requirements must exist; (3) the product's design must have been organized around meeting those specified thermal performance requirements; (4) the product's production must be organized around meeting the specified thermal performance requirements; and (5) the product must have been fully, albeit not necessarily individually, tested to comply with the specified thermal performance requirements.

Final Scope Ruling at 11.

18. In addressing these criteria, Commerce concluded that Wagner's finished heat sink manifold did not satisfy any of the criteria. Specifically, Commerce found that 1) the "805-324's primary purpose is not that of a heat sink; 2) "Wagner has provided no evidence of the certified thermal resistance parameters or specified thermal performance requirements of its part number 805-324"; 3) Wagner "has not demonstrated that part number 805-324's design was organized around meeting those specified thermal performance requirements" and "has not identified the types of specialized equipment that the ITC described as being involved in the design of finished heat sinks, including wind tunnels, flow calibration equipment, or specialized design and data collection software"; and 4) "has not provided sufficient evidence that the product at issue in this scope ruling (i.e., part number 805-324) has been fully tested to meet thermal performance requirements specific to finished heat sinks."

## STATEMENT OF CLAIMS

## COUNT ONE

19. Paragraphs 1 to 18 are adopted and incorporated herein by reference.

20. In its Final Scope Ruling, Commerce analyzed whether Wagner's heat sink manifold fell within the five enumerated criteria for the finished heat sink exclusion.

21. Commerce's determination that Wagner's finished heat sink manifold was not a "fabricated heat sink made from aluminum extrusions" was unsupported by substantial evidence, unreasonable and otherwise not accordance with law.

22. Commerce's determination that specified thermal requirements for Wagner's finished heat sink manifold did not exist was unsupported by substantial evidence, unreasonable and otherwise not accordance with law.

23. Commerce's determination that the design and production of the Wagner finished heat sink manifold is not organized around specific thermal requirements was unsupported by substantial evidence, unreasonable and otherwise not accordance with law.

24. Commerce's determination that Wagner's heat sink manifold was not fully, albeit not necessarily individually, tested to comply with the specified thermal performance requirements was unsupported by substantial evidence, unreasonable and otherwise not accordance with law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

(a) Hold that Commerce's Final Scope Ruling is not in accordance with law and unsupported by substantial record evidence with respect to the claims advanced in this Complaint;

(b) Remand the Final Scope Ruling to Commerce for a determination consistent with the opinion of this Court; and

(c)     provide such other and further relief as the Court deems just and proper.

              Respectfully submitted,

              GRUNFELD, DESIDERIO, LEBOWITZ
              SILVERMAN & KLESTADT LLP

              /s/ Andrew T. Schutz___
              Andrew T. Schutz
              Jordan Kahn
              Michael S. Holton

Dated:  December 18, 2023