## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| WAGNER SPRAY TECH., CORP., | x : : |
| *Plaintiff,* | : : |
| v. | : Court No. 23-00241 : |
| UNITED STATES, | : : |
| *Defendant,* and | : : : |
| ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, | : : : |
| *Defendant-Intervenors.* | : : x |

## <u>PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Pursuant to Rule 56.2 of the Rule of the U.S. Court of International Trade, Plaintiff Wagner Spay Tech., Corp. ("Wagner") respectfully moves for judgment on the administrative record. For the reasons set forth in the accompanying Memorandum of Law in support of its motion, Wagner requests that the Court determine that the U.S. Department of Commerce's results in Commerce Memorandum, "Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on Wagner Finished Heat Sink Manifold" (A-570-976, C-570-968) (October 17, 2023) is not supported by substantial evidence on the record and is otherwise not in accordance with law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

/s/ Andrew T. Schutz
Andrew T. Schutz
Jordan C. Kahn

1201 New York Ave., NW
Suite 650
Washington, DC 20005
(202) 783-6881

Dated: May 29, 2024

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯x | | |
| WAGNER SPRAY TECH., CORP., | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | Court No. 23-00241 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| *Defendant*, | : | |
| and | : | |
| | : | |
| ALUMINUM EXTRUSIONS FAIR TRADE | : | |
| COMMITTEE, | : | |
| | : | |
| *Defendant-Intervenors*. | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯x | | |

### ORDER

Upon consideration of the Motion for Judgment on the Administrative Record filed by Plaintiff Wagner Spray Tech. Corp. ("Wagner"), and upon all other papers and proceedings herein, the Court

ORDERS that Wagner's Motion is granted; and further

FINDS that the contested results of the U.S. Department of Commerce ("Commerce") in Commerce Memorandum, "Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on Wagner Finished Heat Sink Manifold" (A-570-976, C-570-968) (October 17, 2023) ("Final Scope Ruling") was not supported by substantial evidence on the record, and was otherwise not in accordance with law' and further

ORDERS that this matter is remanded to Commerce for reconsideration of the Final

Results in accordance with the decision of this Court.

SO ORDERED.

Dated: _____, 2024         _____
         New York, New York                          Jennifer Choe-Groves, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  | x |  |
|---|---|---|
|  | : |  |
| WAGNER SPRAY TECH., CORP., | : |  |
|  | : |  |
| *Plaintiff*, | : |  |
|  | : | Court No. 23-00241 |
| v. | : |  |
|  | : |  |
| UNITED STATES, | : |  |
|  | : |  |
| *Defendant*, | : |  |
| and | : |  |
|  | : |  |
| ALUMINUM EXTRUSIONS FAIR TRADE | : |  |
| COMMITTEE, | : |  |
|  | : |  |
| *Defendant-Intervenors*. | : |  |
|  | x |  |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
### <u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Andrew T. Schutz
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

*Counsel for Plaintiffs*

Dated: May 29, 2024

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 .................................................................. 1

    A.   Administrative Decision Under Appeal............................................................ 1

    B.   Reasons For Contesting the Administrative Decision ..................................... 1

    C.   Issues Presented and Summary of Argument .................................................. 1

STATEMENT OF FACTS ........................................................................................... 2

  I.    THE ALUMINUM EXTRUSIONS ORDERS AND THE FINISHED HEAT SINK
       EXCLUSION ....................................................................................................... 2

  II.   THE CHALLENGED SCOPE PROCEEDING ................................................... 5

STANDARD OF REVIEW .......................................................................................... 9

ARGUMENT .............................................................................................................. 10

  I.    LEGAL STANDARD FOR SCOPE RULINGS ............................................... 10

  II.   HISTORY OF THE FINISHED HEAT SINK EXCLUSION ......................... 12

    A.   ECCO Scope Ruling ...................................................................................... 13

    B.   Agilent Scope Ruling..................................................................................... 14

  III.  COMMERCE'S FINDING THAT WAGNER'S HEAT SINK MANIFOLD DID NOT
       SATISFY THE FINISHED HEAT SINK EXCLUSION WAS UNLAWFUL .............. 17

    A.   Wagner's Product Is A "Fabricated Heat Sink Made From Aluminum Extrusions" ... 18

    B.   Wagner Identified Specific Thermal Performance Requirements ................................ 21

    C.   Wagner Demonstrated that its Product's Design and Production Is Organized Around
       Thermal Standards.......................................................................................... 25

    D.   Wagner's Product Is Tested to Comply with Thermal Requirements .......................... 28

CONCLUSION............................................................................................................ 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agilent Techs. v. United States*,
    256 F. Supp. 3d 1338 (Ct. Int'l Trade 2017) ..........................................................15

*Agilent Techs. v. United States*,
    335 F. Supp. 3d 1347 (Ct. Int'l Trade 2018) ...............................................15, 16, 18

*Aluminum Extrusions Fair Trade Comm. v. United States*,
    36 C.I.T. 1370 (2012) ...................................................................................................5

*Aluminum Extrusions Fair Trade Comm. v. United States*,
    968 F. Supp. 2d 1244 (Ct. Int'l Trade 2014) ...............................................12, 13, 20

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938).....................................................................................................9

*Duferco Steel, Inc. v. United States*,
    296 F.3d 1087 (Fed. Cir. 2002)...........................................................................11, 29

*Eckstrom Indus., Inc. v. United States*,
    254 F.3d 1068 (Fed. Cir. 2001)..................................................................................17

*Gerald Metals, Inc. v. United States*,
    132 F.3d 716 (Fed. Cir. 1997)......................................................................................9

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984)......................................................................................9

*Meridian Prod., LLC v. United States*,
    851 F.3d 1375 (Fed. Cir. 2017)..................................................................................25

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*,
    2024 WL 2166905 (Fed. Cir. May 15, 2024) ...............................................11, 12, 25

*Save Domestic Oil, Inc. v. United States*,
    357 F.3d 1278 (Fed. Cir. 2004)..................................................................................10

*SKF USA, Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011)..................................................................................10

*WelCom Prods., Inc. v. United States*,
    865 F. Supp. 2d 1340 (Ct. Int'l Trade 2012) .............................................................10

**Statutes**

19 U.S.C § 1516a ............................................................................................................9

**Regulations**

19 C.F.R. § 351.225 ................................................................................2, 10, 11

**Other Authorities**

*Aluminum Extrusions from the People's Republic of China: Antidumping Duty*
    *Order,* 76 Fed. Reg. 30,650 (May 26, 2011) ........................................................2, 3

*Aluminum Extrusions from the People's Republic of China: Countervailing Duty*
    *Order,* 76 Fed. Reg. 30,653 (May 26, 2011) ........................................................2, 3

*Certain Aluminum Extrusions from China*,
    Investigation Nos. 701-TA-475 and 731-TA-1177, Pub. 4229 (May 2011) .................. *passim*

Plaintiff Wagner Spray Tech., Corp. ("Wagner") submits this Memorandum of Law to support its Rule 56.2 Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Decision Under Appeal

Wagner seeks review of the U.S. Department of Commerce's ("Commerce" or the "Department") Final Scope Ruling published in Commerce Memorandum, "Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on Wagner Finished Heat Sink Manifold" (A-570-976, C-570-968) (October 17, 2023) ("Final Scope Ruling") (P.R. 30).[1]

### B.    Reasons For Contesting the Administrative Decision

Wagner's reasons for contesting the administrative decision are set forth in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

### C.    Issues Presented and Summary of Argument

The issue presented on appeal is whether Commerce properly found that Wagner's heat sink manifold (part no. 805-324) did not fall within the finished heat sink exclusion of the antidumping/countervailing duty orders on aluminum Extrusions from China.  Wagner challenges this determination as unreasonable, unsupported by substantial evidence and otherwise contrary to law.  Specifically, Wagner challenges Commerce's determination that its heat sink manifold's design and production are not organized around specified thermal thresholds and that its manifold is not tested to satisfy those thresholds.  Commerce found that the thermal thresholds Wagner identified were the thermal thresholds of the electrical

---

[1] For the convenience of the Court and the parties, we limit our citations to the administrative record of the antidumping segment of the proceeding.  Public documents are identified by their number on the Public Documents Index to the Administrative Record (Docket Entry 18, #2) and cited as "P.R.".  Confidential documents are identified by their number on the BPI Documents Index to the Administrative Record (Docket Entry 18, #3) and cited as "C.R.".

components that the manifold needed to cool rather than the thermal thresholds of the manifold itself.  And, thus, Commerce concluded that meeting the thermal requirements of the electrical components were not sufficient for the purposes of this exclusion.  This finding was wrong.

The physical characteristics and specific thermal requirements for Wagner's manifold fall squarely within the plain terms of the scope exclusion and was supported by substantial evidence. Commerce's finding used certain statements from the International Trade Commission's final report to create an extremely limited interpretation of the scope exclusion which thereby expanded the scope of included items the subject AD/CVD orders.   Section 351.225(k)(1) interpretive materials cannot be used to expand the scope of the order.  The scope language of an order is the "cornerstone" of the scope inquiry and Commerce's interpretation in this case therefore violated that directive.  For this reason, Commerce's scope determination should be remanded for reconsideration.

## STATEMENT OF FACTS

I.    **THE ALUMINUM EXTRUSIONS ORDERS AND THE FINISHED HEAT SINK EXCLUSION**

On May 26, 2011, Commerce issued antidumping ("ADD") and countervailing ("CVD") duties on aluminum extrusions from China. *Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order,* 76 Fed. Reg. 30,650 (May 26, 2011); and *Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order,* 76 Fed. Reg. 30,653 (May 26, 2011) (collectively, "the Orders"). The scope of the Orders is as follows:

> The merchandise covered by the order is aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents). Specifically, the subject merchandise made from aluminum alloy with an Aluminum Association series designation

2

commencing with the number 1 contains not less than 99 percent aluminum by weight. The subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 3 contains manganese as the major alloying element, with manganese accounting for not more than 3.0 percent of total materials by weight. The subject merchandise is made from an aluminum alloy with an Aluminum Association series designation commencing with the number 6 contains magnesium and silicon as the major alloying elements, with magnesium accounting for at least 0.1 percent but not more than 2.0 percent of total materials by weight, and silicon accounting for at least 0.1 percent but not more than 3.0 percent of total materials by weight. The subject aluminum extrusions are properly identified by a four-digit alloy series without either a decimal point or leading letter. Illustrative examples from among the approximately 160 registered alloys that may characterize the subject merchandise are as follows: 1350, 3003, and 6060.

Aluminum extrusions are produced and imported in a wide variety of shapes and forms, including, but not limited to, hollow profiles, other solid profiles, pipes, tubes, bars, and rods. Aluminum extrusions that are drawn subsequent to extrusion (drawn aluminum) are also included in the scope.

Aluminum extrusions are produced and imported with a variety of finishes (both coatings and surface treatments), and types of fabrication. The types of coatings and treatments applied to subject aluminum extrusions include, but are not limited to, extrusions that are mill finished (i.e., without any coating or further finishing), brushed, buffed, polished, anodized (including brightdip anodized), liquid painted, or powder coated. Aluminum extrusions may also be fabricated, i.e., prepared for assembly. Such operations would include, but are not limited to, extrusions that are cut-to-length, machined, drilled, punched, notched, bent, stretched, knurled, swedged, mitered, chamfered, threaded, and spun. The subject merchandise includes aluminum extrusions that are finished (coated, painted, etc.), fabricated, or any combination thereof. . . .

**Also excluded from the scope of this order are finished heat sinks. Finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements.**

*Id.* (emphasis added).

The inclusion of the finished heat sink ("FHS") exclusion in the Orders was a result of

the U.S. International Trade Commission's ("ITC") finding in the companion injury proceeding

that FHSs represented a separate like product from other aluminum extrusions and were not

causing material injury (or threat of material injury) to an industry in the United States. *Certain Aluminum Extrusions from China*, Investigation Nos. 701-TA-475 and 731-TA-1177, Pub. 4229 at 1 (Final) (May 2011) ("ITC Final Report").[2] The ITC provided a description of finished heat sinks in its final determination:

> Finished heat sinks are fabricated heat sinks, sold to electronics manufacturers, the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements.

ITC Final Report at n. 4. The ITC explained further:

> {finished heat sinks ("FHS")} are not different from other aluminum extrusions in terms of their metallurgic chemistry, or by virtue of being further fabricated or produced in custom shapes. **FHS are different from most other aluminum extrusions, however, by virtue of the specific and precise tolerances to which they are generally produced. FHS are designed to remove damaging heat from electronic equipment.** The flat surface tolerance for FHS is often 1/1000 of an inch per inch, compared to 4/1000 to 14/1000 of an inch per inch for ordinary aluminum extrusions. The precise flatness of FHS allows for close contact between the FHS and the heat-generating components for which they have been designed and to which they are attached, thereby reducing or eliminating heat-trapping "dead air."
>
> FHS also differ from other aluminum extrusions (including heat sinks that are not "finished") because of their customized thermal resistance properties. Whereas most aluminum extrusions are differentiated by shape and dimension, FHS are also characterized by their thermal resistance properties. In fact, FHS are certified to perform within thermal resistance parameters. **Although these thermal resistance properties are not visible, they are clearly relevant to the customers for whom FHS have been designed. They make FHS precisely or optimally suited to cool the specific electronic devices for which they have been designed**. . . .

*Id*. at 7 (emphasis added). In addition,

> FHS are produced from aluminum extrusions in a process in which a cut part of an extrusion is held in and fabricated by a computer controlled milling machine to add holes, clearance pockets, and attachment points for heat generating devices. The machined part is typically cleaned and deburred, and it can have one of a variety of finishes applied to it.

---

[2] The ITC Final Report was also included as Exhibit 4 of Wagner's Scope Ruling Request. **CR 1-2/PR 1**.

> Specialized equipment, including wind tunnels, flow calibration
> equipment, testing equipment, and specialized design and data collection
> software, are used to design FHS and to produce prototypes. Highly
> trained employees manage the FHS design and testing equipment.
> Substantial thermal analysis and testing are associated with the front end
> of FHS production.

*Id*. at 8.  The ITC's like product determination regarding finished heat sinks was upheld by this

court in *Aluminum Extrusions Fair Trade Comm. v. United States*, 36 C.I.T. 1370, 1372 (2012).

## II.    THE CHALLENGED SCOPE PROCEEDING

Wagner filed a Scope Ruling Application with Commerce on November 21, 2022

("Scope Ruling Request"), to determine whether its finished heat sink manifold (part no. 805-

324) falls within the Order's FHS exclusion. **CR 1-2/PR 1**.[3] In its application, Wagner

explained:

> The finished heat sink manifold (part no. 805-324) is made of extruded
> aluminum. The aluminum extrusion material used for producing the 805-
> 324 manifold meets specifications for 6061-T6 aluminum alloy. The
> industry-controlled specifications for 6061-T6 are required to achieve
> thermal properties, density, and specific heat capacity of the aluminum
> alloy.
>
> The finished heat sink manifold has a large mass of 1.5 pounds to absorb
> the thermal heat generated from the paint sprayer's pump and printed
> circuit board. For efficient thermal dissipation, the exterior surface of the
> manifold/heat sink is 66 square inches.
>
> The heat sink manifold's mounting surface specification is defined with
> geometric tolerancing (GD&T) for flatness of 3/1000 (.003") for the total
> manifold machined surface. The machined surface area is 2.20" x 4.50".
> Using the shortest distance .003" flatness / 2.20" surface width = .001"
> which equates to 1/1000 inch per inch for the flat surface finish. This flat
> surface is the surface that is attached to the paint sprayer motor and is part

---

[3] On July 1, 2022, Wagner made a prior disclosure and a response to a CF 28 from U.S. Customs and Border Patrol ("CBP") regarding already liquidated entries of Part No. 252-777 and Part No. 805-324.  In this response, Wagner indicated that it believed that Part No. 252-777, which was an extruded aluminum manifold blank, was likely within scope of the Aluminum Extrusions Orders. However, Wagner indicated that part No. 805-324 was likely not subject to the Aluminum Extrusions Orders because it fell within the finished heat sink exclusion, necessitating the filing of the underling scope ruling request.  The prior disclosure is currently pending before CBP awaiting the outcome of this appeal.  Wagner has not imported these products from China since 2021, well before its receipt of the CF 28.

of the key heat sink functionality. In addition to the flatness specification, the surface finished is specified to a maximum micron finish of 125 Ra.

Scope Ruling Request at 3 (**CR 1-2/PR 1**).  Wagner explained how its product operates:

> The 805-324 manifold is custom designed for use exclusively in Wagner's Titan 440 line of paint sprayers. The manifold functions with two main purposes -controlling the flow of liquid paint and heat dissipation to maintain acceptable temperature of the pump and motor. The manifold is computer numeric controlled ("CNC")2 machined from an aluminum extruded blank with dimensions held to high tolerances and stringent quality standards to meet the performance and durability of Wagner's customers' expectations. . . .
>
> The manifold also serves as a heat sink utilizing aluminum because of an excellent coefficient of thermal expansion to maintain a consistent operating temperature. The manifold is bolted to the bottom side of the motor housing and is exposed to air for heat dissipation. The mass size and surface area of the manifold serves as a heat sink that draws heat from the motor and electronic components on a printed circuit board ("PCB"). The circuit board is located at the bottom of the pump assembly and operates at a high temperature. The manifold also pulls heat away from the mechanical action of the piston seals, bushings, etc. As the manifold draws heat away from the motor and PCB it then then dissipates the heat at a consistent rate so as to maintain a stable temperature. The stable temperature permits the paint sprayer to function properly and exceed its life expectancy. Without heat control, the life time of the sprayer would be much shorter.

*Id*. at 4-5.

 

*Id*. at 20-21.

Wagner in its Scope Ruling Request then specifically addressed the two requirements for this exclusion: (1) the design and production of the product must be organized around meeting specified thermal performance requirements, and (2) the product must be fully, but not necessarily individually, tested to meet those specified thermal performance requirements. *Id*. at 17-23.  Specifically, Wagner explained that the design (material type, dimensions and flatness requirements) and production (CNC machined to achieve those tight tolerances) were organized around the manifold being able to meet the thermal requirements in UL 1450.  Wagner then explained how the manifold is tested to satisfy these requirements. *Id*.

On December 22, 2022, Commerce initiated a scope inquiry into Wagner's finished heat sink manifolds. *See* Memorandum, "Initiation of Wagner Spray Tech Corporation (Wagner) Heat Sink Manifold Scope Inquiry," (December 22, 2022) (**PR 2**). On January 30, 2023, Petitioners, the Aluminum Extrusions Fair Trade Committee, filed comments in opposition to Wagner's Scope Ruling Request. Specifically, Petitioners attempted to rebut Wagner's argument that its heat sink manifold falls within the FHS exclusion. **CR 3/PR 14**.  On February 21, 2023, Wagner filed rebuttal comments in response to the domestic interested party's comments. **CR 4/PR 17**.

Commerce issued a supplemental questionnaire to Wagner, which Wagner responded to on September 11, 2023. **CR 5/PR 27.**  In its response, Wagner offered additional details and documentation to explain how the heat sink manifold was designed, organized, and tested around specific thermal requirements.  Specifically, Wagner explained that there are "three main components tested for thermal performance to determine if the heat sink manifold is meeting the necessary thermal resistance parameters."  *Id*. at 1.  This included the thermal standard for the overall sprayer under UL 1450 and then the more specific thermal parameters within that

standard, referred to as UL 746C for the PC board and the motor. *Id.* at 1-2. Wagner then

explained how the manifold is designed and produced around these thermal standards and

provided additional details on how the manifold is tested with the individual electrical

components to ensure that those thermal standards are met. *Id.* at 2-3. Wagner summarized:

> contained within the UL 1450 standard are the temperature standards for
> the individual electrical components under UL746C. The heat sink
> manifold is tested to achieve these temperatures. During testing,
> thermocouples are attached to the relevant PC board components and to
> the motor to determine whether the heat sink manifold is functioning at the
> thermal level needed.
>
> This testing takes place in three stages. Testing first occurs during the
> development phase of the heat sink manifold and other parts. Next, testing
> occurs during a short production run of the newly designed product. Last,
> once regular production starts, random testing occurs to ensure that heat
> sink manifold is operating as needed and maintaining the proper
> temperature levels of the PC board, motor and sprayer overall.

*Id.* at 6.

On September 25, 2023, Petitioners submitted comments on Wagner's Supplemental

Response (**CR 6/PR 28**), which Wagner responded to with rebuttal comments on October 11,

2023. **PR 29**.

On October 17, 2023, Commerce issued its Final Scope Ruling in which it found that

Wagner's finished heat sink manifolds did not meet the requirements of the FHS exclusion in the

Orders. Commerce concluded that to meet the FHS exclusion, a product must meet the following

criteria:

> (1) the product must be a "fabricated heat sink made from aluminum
> extrusions;" (2) specified thermal performance requirements must exist;
> (3) the product's design must have been organized around meeting those
> specified thermal performance requirements; (4) the product's production
> must be organized around meeting the specified thermal performance
> requirements; and (5) the product must have been fully, albeit not
> necessarily individually, tested to comply with the specified thermal
> performance requirements.

Final Scope Ruling at 11 (**PR 30**).

When applying these criteria to Wagner's finished heat sink manifold, Commerce found that the product did not satisfy any of them. Specifically, Commerce determined that the "805-324's primary purpose is not that of a heat sink." Furthermore, Commerce found that "Wagner has provided no evidence of the certified thermal resistance parameters or specified thermal performance requirements of its part number 803-324," and did not demonstrate "that part number 805-324's design was organized around meeting those specified thermal performance requirements" and had "not identified the types of specialized equipment that the ITC described as being involved in the design of finished heat sinks, including wind tunnels, flow calibration equipment, or specialized design and data collection software." Finally, Commerce held that Wagner had "not provided sufficient evidence that the product at issue in this scope ruling (i.e., part number 805-324) has been fully tested to meet thermal performance requirements specific to finished heat sinks."

## <u>STANDARD OF REVIEW</u>

This Court must hold unlawful any portion of Commerce's decisions that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, __ (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from with conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States,* 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

9

"Despite Commerce's statutory discretion,… if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1372 (Fed. Cir. 2011) (quotation omitted). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *Id*. "If the Department provides 'no reasonable explanation' for changing a practice that it has 'consistently followed,' such a change is an unacceptable agency practice." *WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (Ct. Int'l Trade 2012).

## **ARGUMENT**

## I.    **LEGAL STANDARD FOR SCOPE RULINGS**

Commerce conducts scope rulings pursuant to 19 C.F.R. § 351.225.  Section (k)(1) of that regulation governs how Commerce is to determine whether a particular requested product is within the scope of the relevant AD/CVD Order.  This section states:

> (1) In determining whether a product is covered by the scope of the order at issue, the Secretary will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive.

> (i) The following primary interpretive sources may be taken into account under paragraph (k)(1) introductory text of this section, at the discretion of the Secretary:

> (A) The descriptions of the merchandise contained in the petition pertaining to the order at issue;

> (B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;

(C) Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and

(D) Determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

(ii) The Secretary may also consider secondary interpretive sources under paragraph (k)(1) introductory text of this section, such as any other determinations of the Secretary or the Commission not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence. However, in the event of a conflict between these secondary interpretive sources and the primary interpretive sources under paragraph (k)(1)(i) of this section, the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue.

19 C.F.R. § 351.225(k)(1).

In Commerce's scope analyses, AD/CVD orders "may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002). The scope language of the order is the "cornerstone" of this analysis and 'a predicate for the interpretive process.'" *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 2024 WL 2166905, at *9 (Fed. Cir. May 15, 2024) ("Saha Thai"), quoting *Duferco Steel*, 296 F.3d at 1097. "Although the scope of the order can be clarified, the scope language cannot be interpreted or 'changed in a way contrary to its terms.'" *Id*. Upon conducting this initial review of the scope language "{i}f the scope language expressly and dispositively resolves whether the subject merchandise falls within or outside of the scope, the scope analysis comes to an end." *Id*. If the scope language itself does not clearly resolve the inquiry, then Commerce may consult the sources outlined in (k)(1). The court however has made clear that "the (k)(1) materials cannot control or alter the scope language of the order" but rather, "they serve as interpretative aids that

clarify or support Commerce's understanding of the scope language that Commerce may arrive at upon reviewing the scope language itself." *Saha Thai* at *11.

## II.    HISTORY OF THE FINISHED HEAT SINK EXCLUSION

The finished heat sink exclusion was added to the scope of the Orders by virtue of the ITC's finding that finished heat sinks are a separate like product from other aluminum extrusions and were not causing material injury, or threatening to cause injury, to the domestic industry. ITC Final Report at 27, 29.  In Commerce's companion AD/CVD investigation and final Orders, Commerce implemented the ITC's "no injury" finding for finished heat sinks by adding an express exclusion to the scope of the case.  The exclusion reads:

> Also excluded from the scope of these Orders are finished heat sinks. Finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements.

In adding this exclusion, Commerce removed the phrase "sold to electronics manufacturers" from the ITC's description of "finished heat sinks."

The Aluminum Extrusions Fair Trade Committee, the petitioners in the original investigation (and defendant-intervenors here), appealed Commerce's final determination and failure to include the phrase "sold to electronics manufacturers" in the finished heat sink scope exclusion.  The Petitioners claimed that "the Department . . .  produced AD and CVD orders so vague as to 'effectively expand the Commission's definition of 'finished heat sink,' thereby unlawfully denying relief to a segment of the U.S. industry that the Commission found to be materially injured.'" *Aluminum Extrusions Fair Trade Comm. v. United States*, 968 F. Supp. 2d 1244, 1249–55 (Ct. Int'l Trade 2014).

In affirming Commerce's removal of "sold to electronics manufacturers" from the heat sink exclusion, the court noted that "the ITC report itself, examined in detail, does not support the proposition that the four words omitted by the Department actually are critical to the product and industry definitions developed by the Commission." *Id.* The court further noted that the ITC focused on "two physical properties—(1) their precise design and finish characteristics and (2) their thermal resistance properties that are intended to meet the specific needs of a given piece of electronic equipment" and that "{t}his suggests that the ITC itself relies primarily on physical properties to define FHS, making it reasonable for the Department to interpret the omitted 'sold to electronics manufacturers' as redundantly descriptive rather than limiting language." *Id.*

Over the life of the Orders, there have been several scope rulings related to this exclusion.

### A.    ECCO Scope Ruling

In the Scope Ruling on ECCO's Heat Sinks For LED Light Bars (Nov. 24, 2014)[4], the product at issue was a heat sink for bars of LED emergency lights designed to be mounted to the roof of the vehicle, which also served as the housing for the lights. Commerce found that the products did not meet the finished heat sink exclusion because ECCO had failed to provide evidence that the products satisfied the two necessary criteria: "(1) the design and production of the product must be organized around meeting specified thermal performance requirements; and, (2) the product must be fully, but not necessarily individually, tested to meet those specified thermal performance requirements." Commerce identified the following failures in ECCO's scope request:

---

[4] Wagner Scope Ruling at Exhibit 5 (**CR 1-2/PR 1**).

- "ECCO failed to identify the specific thermal performance requirements that the products at issue are intended to meet anywhere on the record. Rather, it merely asserts that the thermal performance requirements for heat sinks are not specified in the Orders or in the final determination of the original investigation and notes that each application has its own unique thermal performance requirements."

- "ECCO did not identify the target thermal resistance that the products at issue are designed to meet, nor did it provide any evidence showing how or why the design and production of the product was organized to meet the cooling requirements of the specific electronic devices in the LED light bar."

- "The ITC Final Report explains that, "the precise flatness of FHS allows for close contact between the FHS and the heat-generating components for which they have been designed and to which they are attached, thereby reducing or eliminating heat-trapping "dead air.""121 However, we find that ECCO also failed to demonstrate that the product at issue was attached to the heat generating components it is designed to cool."

### B.    Agilent Scope Ruling

In the Final Scope Ruling on Agilent Technologies, Inc.'s ("Agilent") Mass Filter Radiator (August 10, 2016),[5] the product at issue was Agilent's mass filter radiator ("MFR"). This consisted of a "solid cohesive aluminum extrusion product consisting of machined extruded aluminum, which is plated with a proprietary material, and which is specifically designed and fabricated for use in Agilent's mass spectrometer." *Id.* Specifically, the "MFR is the structure that houses the mass selection quadrupole and the ion source, which are central components for the functioning of the mass spectrometer" and "also transfers heat from the high temperature ion source to the quadrupole, thus preventing the collection of ion burn on the surface of the quadrupole." The "MFR has been precision fabricated using computer numerical control (CNC) processing." *Id.* In its scope ruling request, Agilent argued that:

> MFR is a heat sink, precisely designed according to specific specifications to absorb and transfer heat away from the heat source of the mass spectrometer to the quadrupole. Agilent further argues that the MFR "performs within very specific thermal resistance parameters." Agilent advances that Agilent research and development (R&D) developed

---

[5] *Id.* at Exhibit 6.

drawing specifications for the MFR which were "developed around the thermal properties of the MFR.

Despite Agilent's arguments, Commerce concluded that the MFR did not satisfy the two criteria of finished heat sinks:

> Agilent does not provide compelling evidence that the "design and production" of its MFR is "organized around meeting specified thermal performance requirements." Agilent identified specific surface finish, flatness, perpendicularity, and locational tolerances for its MFR. However, as explained in ECCO LED Light Bars Scope Ruling, such requirements are not in and of themselves "specified thermal performance requirements," around which the design and production of the product is organized. Agilent also provides certain thermal performance metrics under which the MFR is tested. However, Agilent has not demonstrated that the "design and production" of its MFR was "organized around meeting any specified thermal performance requirements," or that such thermal performance specifications existed at that time.

Agilent appealed this scope determination to this Court, resulting in two remands: *Agilent Techs. v. United States*, 256 F. Supp. 3d 1338, 1344–45 (Ct. Int'l Trade 2017), and *Agilent Techs. v. United States*, 335 F. Supp. 3d 1347, 1350 (Ct. Int'l Trade 2018) ("*Agilent II*"). In *Agilent II*, the Court first recited the Commerce's newly stated five requirements for satisfying the heat sink exclusion:

> 1) the product must be a "fabricated heat sink{} made from aluminum extrusions;" 2) specified thermal performance requirements must exist; 3) the product's design must have been organized around meeting those specified thermal performance requirements; 4) the product's production must be organized around meeting the specified thermal performance requirements; and 5) the product must have been fully, albeit not necessarily individually, tested to comply with the specified thermal performance requirements. We have determined that in accordance with the language of the scope, all five of these elements must be present for the {mass filter radiator} to be a finished heat sink.

*Agilent II* at 1352-53. In the Remand Results, Commerce concluded that:

> Agilent did not provide evidence of any specified thermal performance requirements, particularly related to the design, production, and testing of its products to meet the specified thermal performance requirements. See

Remand Results 42–43. Commerce determined that "dimensional tolerances, regardless of precision, and regardless of documentation, even those established pursuant to enhancing thermal performance, are not 'specified thermal performance requirements,' and do not turn ... [products] into finished heat sinks for purposes of the scope exclusion at issue." Id. at 25. The Department noted that the use of computer controlled milling machine processing to produce a product also does not make it a finished heat sink. Id. at 24–25. . . .  Based on this perceived lack of evidence, Commerce concluded that Agilent's mass filter radiator did not meet the finished heat sink exclusion requirements and was included in the scope of the Orders.

Id. at 1353.  The Court rejected Commerce's Remand Results, and in particular its treatment of "specified thermal performance requirements."  The Court dismissed Commerce's reliance on the "Final ECCO Light Bars Scope Ruling for support that "dimensional or other physical tolerances" are not specified thermal performance requirements "even if such physical tolerances are specifically identified, are precise, and are established explicitly to enhance thermal performance."" Id. at 1354.  Explaining that reliance on this scope ruling was misplaced, the court stated that:

In ECCO, Commerce found that "ECCO fail[ed] to demonstrate how these identified specifications translate into ECCO's product meeting specified thermal performance requirements." Id. The key element is apparently the need for a "translation" or explanation of how the physical design meets specified thermal performance requirements. See id. ECCO supports an analysis of specific facts to determine whether physical design requirements can establish the existence of specified thermal performance requirements. A company must provide information explaining how the physical elements lead to specified thermal performance requirements—a "translation"—something that ECCO failed to do, but the possibility is not precluded.

Id.

Before issuing another Remand Results, Commerce settled the case with Agilent.  The settlement permitted Commerce to leave the final scope ruling unchanged in exchange for a return of Agilent's duties and predeposit interest deposited as part of a prior disclosure. Any other entries other than those covered by the settlement agreement remained subject to duties.

16

### III.  COMMERCE'S FINDING THAT WAGNER'S HEAT SINK MANIFOLD DID NOT SATISFY THE FINISHED HEAT SINK EXCLUSION WAS UNLAWFUL

Commerce's ruling that Wagner's heat sink manifold (part number 805-324) is within the scope of the Orders unsupported by substantial evidence and was otherwise unreasonable. Record evidence shows that Wagner's heat sink manifold falls both within physical description of a finished heat sink and the express criteria outlined in the exclusion.  Commerce's finding to the contrary was based on an unreasonable interpretation of the testing, design and production requirements of the scope exclusion.  This interpretation served to severely limit the exclusionary language and expand the scope of these orders to include products that fall within the plain language of the exclusion. *See Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1073 (Fed. Cir. 2001) (refusing to give the order the broad interpretation urged by the government because such a broad construction was "belied by the terms of the Order itself.").

The finished heat sink exclusion states that "finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements."  To assess whether a product falls within this exclusion, Commerce developed a set of five criteria, used in this case and others:

(1) the product must be a "fabricated heat sink made from aluminum extrusions;"

(2) specified thermal performance requirements must exist;

(3) the product's design must have been organized around meeting those specified thermal performance requirements;

(4) the product's production must be organized around meeting the specified thermal performance requirements; and

(5) the product must have been fully, albeit not necessarily individually, tested to comply with the specified thermal performance requirements.

Scope Ruling at 11 (**PR 30**).  These five criteria are consistent with the plain language of the exclusion and the ITC's Final Report.  *Agilent II.,* 335 F. Supp. 3d at 1352-53.  While the criteria that Commerce used to analyze whether Wagner's heat sink manifold fell within the exclusion was reasonable, Commerce's analysis of the record evidence and whether the criterion were met was not.

### A.    Wagner's Product Is A "Fabricated Heat Sink Made From Aluminum Extrusions"

For the first step in the analysis, Commerce assessed whether Wager's heat sink manifold was a fabricated heat sink made from aluminum extrusions.  Commerce determined that while Wagner's product had all the physical and functional properties of a heat sink – "it dissipates heat and has specifications for flatness that are similar to the flat surface measurements identified by the ITC" – that it was not a heat sink because "{t}he identification of the part in Wagner's owner's manual as a pump valve rather than heat sink, along with Wagner's description of part number 805-324 as controlling the flow of paint, suggest that part number 805-324's primary purpose is not that of a heat sink." Scope Ruling at 11.  This finding is unreasonable and inconsistent with the plain language of the scope exclusion and the ITC's report.

There can be no dispute that Wagner's product operates as a heat sink.  The ITC explained that heat sinks "cool the specific electronic devices for which they have been designed."  ITC Final Report at 7.  To achieve this heat dissipating function, the ITC explained that heat sinks are CNC machined to have tight tolerances and flatness levels.

The ITC specifically discussed the flatness specification of 1/1000 inch per inch as a distinguishing factor of finished heat sinks:

> **FHS are different from most other aluminum extrusions, however, by virtue of the specific and precise tolerances to which they are generally produced. FHS are designed to remove damaging heat from electronic equipment.** The flat surface tolerance for FHS is often 1/1000 of an inch per inch, compared to 4/1000 to 14/1000 of an inch per inch for ordinary aluminum extrusions.[20] The precise flatness of FHS allows close contact between the FHS and the heat-generating components for which they have been designed and to which they are attached, thereby reducing or eliminating heat-trapping "dead air.

*Id.* at 7. Wagner explained in its scope ruling request that that part number 805-324 had

precisely this specification:

> The manifold heat sink mounting surface finished specification is defined with geometric tolerancing (GD&T) for flatness of 3/1000 (.003") for the total manifold machined surface. The machined surface area is 2.20" x 4.50". Using the shortest distance .003" flatness / 2.20" surface width = .001" (1/1000) inch per inch flat surface finish. In addition to the flatness specification, the surface finished is specified to a maximum micron finish of 125 Ra.

Scope Ruling Request at 19-20 (providing design specifications confirming these figures) (**CR.1-**

**2/PR 1**). Wagner then summarized that:

> For Wagner's finished heat sink manifold, the flatness specification permits the manifold to have close contact with the paint sprayer's heat generating components. The manifold is bolted to the bottom side of the motor housing and is exposed to air for heat dissipation. The mass size and surface area of the manifold serves as a heat sink that draws heat from the motor and electronic components on a printed circuit board ("PCB"). The circuit board is located at the bottom of the pump assembly and operates at a high temperature. The manifold also pulls heat away from the mechanical action of the piston seals, bushings, etc. As the manifold draws heat away from the motor and PCB it then dissipates the heat at a consistent rate so as to maintain a stable temperature. The stable temperature permits the paint sprayer to function properly.

*Id.* at 21-22. Thus, there can be no dispute that Wagner's heat sink manifold has the same

physical characteristics and use as the finished heat sinks described in the ITC final report.

Despite the same characters and use, Commerce found Wagner's product not to be a heat

sink because it was referred to as a "pump block" in Wagner's materials and because the product

19

had a dual function of controlling the flow of paint.  This caused Commerce to conclude that

"part number 805-324's primary purpose is not that of a heat sink."  This conclusion is

inaccurate and unreasonable for two reasons.  First, there is nothing in the k(1) materials that

states that a finished heat sink cannot have a dual purpose.  The ITC report identifies key

characteristics to be a heat sink, Indeed, this court has already noted that ITC focused on "two

physical properties—(1) their precise design and finish characteristics and (2) their thermal

resistance properties that are intended to meet the specific needs of a given piece of electronic

equipment" and that "{t}his suggests that the ITC itself relies primarily on physical properties to

define FHS." *Aluminum Extrusions Fair Trade Comm*, 968 F. Supp. 2d at 1252.  Wagner's

product indisputably has these physical characteristics.

Second, there is no evidence on the record that the "primary purpose" of 805-324 is "not

that of a heat sink."  The dissipation of heat away for the electrical components of the sprayer is

at least equally as important as the control of the flow of paint.  Paint can flow through any type

of material or shape.  In contrast, heat sinks can only be made of certain material and have

certain surface finishes to achieve the desired result.  Since these characteristics are focused on

the dissipation of heat and the sprayer cannot function if the motor or PC board overheats, the

heat sink capability of 805-324 is more of its purpose than controlling the flow of paint.  Or at

the very least, the two functions are equal.  Relying on this "primary purpose" designation,

which is not included in any of the (k)(1) materials or the language of the order was therefore

unreasonable and unsupported by substantial evidence.

B.    **Wagner Identified Specific Thermal Performance Requirements**

Commerce next analyzed whether Wagner's product had "specified thermal performance requirements".  In looking at this criterion, Commerce assessed whether the product has "customized thermal resistance properties."  Commerce concluded:

> while Wagner has demonstrated that standards for safe operating temperatures exist for the downstream product (i.e., the paint sprayer) and for other components of the downstream product (i.e., PC board and motor), we find that it has not demonstrated that specified thermal performance requirements exist for the product at issue in this scope inquiry (i.e., part number 805-324). Wagner stated that the "thermal performance requirements of {part number 805-324} are tied to the performance components that the {part number 805-324} is designed for." However, we find that the thermal performance of part number 805-324 being "tied to" the operating temperature standards for the downstream product is not sufficient to meet the specific requirements of the finished heat sink scope exclusion, which requires that specified thermal performance requirements must exist for the inquiry merchandise. The ITC stated that finished heat sinks are "certified to perform within thermal resistance parameters," and Wagner has provided no evidence of the certified thermal resistance parameters or specified thermal performance requirements of its part number 805-324. Therefore, we find that Wagner has not satisfied the second requirement for a product to meet the finished heat sinks exclusion.

Scope Ruling at 13 (**PR 30**).  This finding is unreasonable and unlawfully limits the exclusion.

The plain language of the heat sink exclusion states that to be excluded, the design and production of the product must be "organized around meeting specific thermal performance requirements."  The exclusionary language does not provide any additional description of what this phrasing means or how it is satisfied. Because this phrasing is not clear, Commerce looked to the ITC Final Report for guidance, focusing on this section of the report:

> FHS also differ from other aluminum extrusions (including heat sinks that are not "finished") because of their customized thermal resistance properties. Whereas most aluminum extrusions are differentiated by shape and dimension, FHS are also characterized by their thermal resistance properties. In fact, FHS are certified to perform within thermal resistance parameters. Although these thermal resistance properties are not visible,

> they are clearly relevant to the customers for whom FHS have been
> designed. They make FHS precisely or optimally suited to cool the
> specific electronic devices for which they have been designed.

ITC Final Report at 7.  In assessing this description, Commerce found that it establishes two

requirements for the "meeting specific thermal performance requirements" criteria.  First,

Commerce found that the thermal performance requirements apply to the FHS themselves and

not how the FHS achieve thermal performance requirements for the electrical components that

the heat sinks are designed to cool.  Commerce states "the thermal performance of part number

805-324 being "tied to" the operating temperature standards for the downstream product is not

sufficient to meet the specific requirements of the finished heat sink scope exclusion, which

requires that specified thermal performance requirements must exist for the inquiry

merchandise." Scope Ruling at 13. Second, Commerce found that the FHS must be "certified to

perform within thermal resistance parameters."  *Id*. Commerce then concluded that Wagner's

product was not certified and, therefore, did not meet this requirement.

Commerce's interpretation and analysis is illogical.  There is no basis for Commerce's

limiting criteria for excluded finished heat sinks.  First, the ITC Final report say that FHS are

"*characterized* by their thermal resistance properties." ITC Final Report at 7.  Wagner's part

number 805-324 indisputably are characterized by thermal resistance proprieties.  Wagner's

manifold must be able to cool the motor, PC board and sprayer to the temperature requirements

in UL 746C and UL 1450.  The only way in which a heat sink can cool a hotter electrical

component by merely attaching to that hotter product is if the heat sink has thermal resistant

proprieties.  If the heat sink was not thermal resistant, then the heat sink would heat up in lock

step with the heating of the electrical components, which would defeat its purpose. Thus,

Wagner's part number 805-324 must have sufficient thermal resistance properties to cool the

motor, PC Board and sprayer to their desired threshold temperatures making Wagner's heat sink organized to meet specific thermal performance requirements.

Wagner explained these thermal performance requirements in detail in its supplemental response:

1) The thermal standard for the sprayer overall is the UL 1450 test. This requires that the sprayer operate at a temperature under 125 degrees Celsius. The only component that reduces the overall heat of sprayer is the heat sink manifold. This was discussed in both our scope request and rebuttal comments filed on February 17, 2023, in detail. The heat sink manifold must be designed and tested in such a manner so as to prevent the sprayer from being over 125 degrees Celsius.

2) The PC board, which is one of two main electrical components in the sprayer that the heat sink is attached to, must comply with the temperature parameters outlined in UL 746C, which is included within the UL 1450 standard. **Exhibit 1** contains an excerpt from the individual component testing. This excerpt is from page 13 of the UL 1450 test, provided in full in **Exhibit 2**. This standard has specific temperatures performance requirements and resistance parameters for two parts of the PC board:

    a. [Bridge rectifier] temperature rise of 65 degrees C and maximum of 86.41 C; and

    b. [Triac 25 A 600V] temperature rise of 65 degrees C and maximum of 86.25 C.

3) The motor, which is the other main electrical component that the heat sink is attached to, must comply with the temperature parameters outlined UL 746C, which is included within the UL 1450 standard. See **Exhibit 1**. This standard has specific temperatures performance requirements and resistance parameters:

    a. [Motor - Armature Core EL00607] temperature rise of 140 degrees C and maximum of 162.51 C.

Finished heat sinks are repeatedly identified in the ITC Report from the original investigation by two physical properties—(1) their precise design and finish characteristics and (2) their thermal resistance properties that are intended to meet the specific needs of a given piece of electronic equipment. *See, e.g., ITC Report* at 7. The temperature parameters of the electrical components, as outlined in UL 746C and the overall sprayer as outlined in UL 1450, are the temperature parameters of the heat sink manifold.

Wagner Supp Response at 1-2 (**CR 5/PR 27**).[6]

---

[6] Wagner no longer claims business proprietary treatment of the bracketed words in this excerpt.

The ITC Final Report does not explain, describe, or detail what type of thermal performance standards are required for finished heat sinks.  The ITC Final Report does not discuss specific equations or measurements that are required to assess thermal resistance or conductivity, or the different types of thresholds needed for a FHS.  The ITC Final Report only notes that finished heat sinks have "*customized* thermal resistance properties" relative to "to the customers for whom FHS have been designed."  ITC Final Report at 7.  This demonstrates that the thermal performance requirements are dictated by the end product for which the heat sink is intended for.  Thus, the thermal performance needs of the electrical components are necessarily the thermal performance requirements of the heat sink.  Commerce rejected Wagner's contentions without defining what "specified thermal requirements" are or identifying a (k)(1) source with such a definition or parameter; the ITC's Final Report does not include such a definition. It is therefore unreasonable Commerce to conclude here that the thermal performance standards of the motor, PC board and sprayer, for part number 805-324 is solely responsible for cooling, are not the thermal performance requirements for part number 805-324.

Second, it is unreasonable to require excluded heat sinks to have a "certification" for thermal resistance.  There is no explanation in the ITC Final Report on what this "certification" is, what it entails, or the entity that issues the "certification."  The only citation in the report for this premise is to a questionnaire response from one heat sink producer, Aavid.  In other portions of the ITC Final Report, it appears that this "certification" is nothing more than an "assurance" from that same supplier.  ITC Final Report at 33.  If heat sinks are required to have a thermal resistance certifications to be excluded, then this should be stated expressly in scope language. "Although a party's description of merchandise in these sources may aid Commerce in making its determination, that description "cannot substitute for language in the order itself" because

"[i]t is the responsibility of [Commerce], not those who [participated in] the proceedings, to determine the scope of the final orders." *Meridian Prod., LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017). Using a (k)(1) material in this manner to incorporate an express requirement (based on a party's description in the ITC proceeding) not found in the scope exclusionary language unlawfully expands the scope of the order. *See Saha Thai* at *15 ("While the (k)(1) materials may aid in clarifying the scope of an order, they cannot rewrite or change the scope of the order").

### C. Wagner Demonstrated that its Product's Design and Production Is Organized Around Thermal Standards

Commerce's analysis of the third and fourth criteria followed a similar path, each of which were unreasonable. The third and fourth criteria address whether the design and production of the product is organized around meeting specified thermal performance requirements. In addressing each criterion, Commerce first found that neither were met "because Wagner has not demonstrated that specified thermal performance requirements exist, as explained above {in criteria two}." Final Scope Ruling at 13-14 (**PR 30**). As already addressed above, this finding is unreasonable, contrary to the ITC Final Report and unsupported by substantial evidence.

Notwithstanding the finding that no thermal performance requirements existed, Commerce nevertheless reviewed the design and production of Wagner's product. Finding that the design was not sufficient, Commerce explained "Wagner has not identified the types of specialized equipment that the ITC described as being involved in the design of finished heat sinks, including wind tunnels, flow calibration equipment, or specialized design and data collection software." *Id*. at 14. For production, Commerce similarly found that "Wagner has not identified the types of specialized equipment that the ITC described as being involved in the

production of finished heat sinks, including wind tunnels, flow calibration equipment, or specialized design and data collection software, or described any of the substantial thermal analysis that is associated with finished heat sink production." *Id*. at 14-15.

Commerce's finding that the design and production necessary to fall within this can only be conducted by "wind tunnels, flow calibration equipment, or specialized design and data collection software" is unreasonable and inconsistent with ITC Final Report.   First, these items relate solely to the design phase and creation of prototypes.[7]   They do not relate to production of the commercial product.   For production, the ITC report focuses solely on CNC machining.[8] ITC Final Report at 8.   The ITC explained that "FHS are produced from aluminum extrusions in a process in which a cut part of an extrusion is held in and fabricated by a computer controlled milling machine to add holes, clearance pockets, and attachment points for heat generating devices."   *Id*.   Wagner explained in its supplemental response that:

> the key physical characteristic of the heat sink manifold that permits it to achieve the necessary thermal parameters is the flat surface tolerance. When Wagner selected the production process needed to achieve these tight tolerances, the only production method available to achieve these results was CNC machining. The same results could not be achieved by other production processes.

Wagner Supp Response at 6 (**CR 5/PR 27**).   In addition, "The finished heat sink manifold material and production process is based on strength, heat absorption, ability to hold tight tolerance, and superior surface finish."   *Id*. at 3. This precise machining makes "FHS . . . different from most other aluminum extrusions . . . by virtue of the specific and precise

---

[7] *See* ITC Final Report at 8 ("Specialized equipment, including wind tunnels, flow calibration equipment, testing equipment, and specialized design and data collection software, *are used to design FHS and to produce prototypes*."
[8] *Id*.

tolerances to which they are generally produced." *Id*. Thus, Commerce's analysis with the regard

to Wagner's production is inconsistent with the ITC's description of the production process.

Second, while the ITC Final Report outlines various ways in which FHS are designed,

there is no indication in the report that this is the *only* manner in which FHS can be designed.

Again, if FHS can only be designed using certain methodologies then this express requirement

should have been included the scope language.  To be clear, the scope does not address the

method of design *at all* but rather that the design must focus on achieving thermal requirements.

Indeed, the "custom" nature of FHS necessarily dictates different design methodologies to match

the particular situation.  Wagner explained how it designs its products:

> In the development stage, the electronic PC board components and electric
> motor are tested in the Wagner Spray Tech ETL approved laboratory. The
> engineering department tests the standalone component prototypes on a
> test bench for measuring maximum operating temperatures that are then
> compared to the maximum thermal UL test standards for those
> components. The prototype test results are used for the design of the
> finished heat sink manifold to achieve the UL thermal requirements. That
> is, the difference in the operating temperature and the UL thermal
> requirements is the amount of heat that the heat sink manifold must diffuse
> or "pull away" from the electrical components. Thus, pre-production
> protype testing results for the individual components are used for defining
> the finished heat sink thermal resistance parameters.
>
> The UL 1450 temperature requirements are continually reviewed and early
> prototype testing takes place to verify that the temperature requirements
> are achieved. Changes are then made to the heat sink manifold based on
> actual test results and then the product is tested again until the temperature
> of the motor, housing touch points and electrical components are within
> the acceptable limits to meet UL 1450 requirements.

Wagner Supp Response at 2-3 (**CR 5/PR 27**).  This process identifies the shape, size and flatness

needed to achieve the desired thermal requirements.  The flatness, surface finish and other details

are then put into specifications that are provided to the supplier.  *Id*. at 4-5 and Exh. 3.  This

information demonstrates that the design of the Wagner's heat sink manifold is organized around specific thermal requirements.

### D. Wagner's Product Is Tested to Comply with Thermal Requirements

Finally, Commerce's testing analysis is similarly flawed and unsupported by substantial evidence. Commerce concluded that:

> Although Wagner provided evidence of certain testing that the downstream paint sprayer undergoes to comply with UL 1450 standards for the operating temperatures of paint sprayers, we find that it has not provided sufficient evidence that the product at issue in this scope ruling (i.e., part number 805-324) has been fully tested to meet thermal performance requirements specific to finished heat sinks.101 As explained above, according to the ITC, finished heat sinks have specific, identified thermal resistance properties, and the devices are tested to ensure that they function within the specified thermal resistance parameters. We find that Wagner has not identified those thermal resistance parameters or demonstrated that part number 805-324 has been tested to comply with the specified thermal performance requirements.

Scope Ruling at 15 (**PR 30**). At bottom, Commerce concludes that Wagner's testing of part number 805-324 with the electrical components the heat sink works to cool is insufficient for the purposes of this exclusion. This interpretation is unreasonable and unsupported for several reasons.

First, Wagner did in fact identify thermal resistance parameters and demonstrate that the heat sinks are tested to achieve these parameters:

> contained within the UL 1450 standard are the temperature standards for the individual electrical components under UL746C. The heat sink manifold is tested to achieve these temperatures. During testing, thermocouples are attached to the relevant PC board components and to the motor to determine whether the heat sink manifold is functioning at the thermal level needed.
>
> This testing takes place in three stages. Testing first occurs during the development phase of the heat sink manifold and other parts. Next, testing occurs during a short production run of the newly designed product. Last, once regular production starts, random testing occurs to ensure that heat

28

> sink manifold is operating as needed and maintaining the proper
> temperature levels of the PC board, motor and sprayer overall.

Wagner Supp Response at 7 (**CR 5/PR 27**).  Second, this is a custom product that is only produced for Wagner to work for Wagner's products.  The only manner in which to test whether part number 805-324 is achieving the necessary thermal requirements is to test it along with the electrical components.  This is not a commodity heat sink to be used with different electronical components of different customers, thereby requiring a generic resistance factor.  There is nothing in the ITC Final Report which states that FHS cannot be tested in different manners or that it cannot be tested along with the electrical components they seek to cool.

In sum, Commerce's interpretation of each of the criteria for the FHS exclusion was either unreasonable or unsupported by substantial evidence.  Commerce used the language contained in the ITC Final Report to define the FHS exclusion contrary to the terms of the order. Commerce's interpretation significantly limited the products that can qualify for the FHS exclusion, thereby significantly expanding the products that are within the scope of the case. While (k)(1) materials can be used as a guide for Commerce's interpretation of the scope they cannot be used to expand the scope beyond its plain terms.  *Duferco Steel, Inc*., 296 F.3d at 1097.

## **CONCLUSION**

Wagner requests that this Court hold that Commerce's Final Scope Ruling is unsupported by substantial evidence and otherwise not in accordance with law and remand the Final Results with instructions to issue a new determination that is consistent with the Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Jordan C. Kahn

1201 New York., Ave., NW
Suite 650
Washington, DC 20005
(202) 783-6881

Dated: May 29, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum of Law In Support of its Motion for Judgment on the Agency Record, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 9,268 words, less than the 14,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Counsel for Plaintiffs*

Dated: May 29, 2024