THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| ———————————————————— ) | |
| WAGNER SPRAY TECH., CORP., ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Court No. 23-00241 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| *Defendant,* ) | |
| ) | |
| and ) | |
| ) | |
| ALUMINUM EXTRUSIONS FAIR TRADE ) | |
| COMMITTEE, ) | |
| ) | |
| *Defendant-Intervenor.* ) | |
| ———————————————————— ) | |

**ORDER**

Upon consideration of the Motion for Judgment on the Administrative Record filed by plaintiff Wagner Spray Technologies Corporation (Wagner), and upon all other papers and proceedings herein, the Court

ORDERS that Wagner's motion is denied; and further

FINDS that the determination by the United States Department of Commerce, as set forth in "Aluminum Extrusions from the People's Republic of China:  Final Scope Ruling on Wagner Finished Heat Sink Manifold" (A-570-976, C-570-968) (October 17, 2023), is supported by substantial evidence on the record and is otherwise in accordance with law.

SO ORDERED.

Dated: _____, 2024        _____
       New York, New York                 Jennifer Choe-Groves, Judge

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                          )
WAGNER SPRAY TECH., CORP.,                )
                                          )
              *Plaintiff*,                )
                                          )
       v.                                 )     Court No. 23-00241
                                          )
UNITED STATES,                            )
                                          )
              *Defendant*,                )
                                          )
       and                                )
                                          )
ALUMINUM EXTRUSIONS FAIR TRADE            )
COMMITTEE,                                )
                                          )
              *Defendant-Intervenor*.     )
_____   )

### DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON AGENCY RECORD

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                               /s/ Collin T. Mathias
Jared M. Cynamon                          COLLIN T. MATHIAS
Attorney                                  Trial Attorney
Office of the Chief Counsel               Commercial Litigation Branch
   for Trade Enforcement and Compliance

U.S. Department of Commerce
Washington, D.C.
Telephone: (202) 482-0131

Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 305-7571
Email: collin.t.mathias@usdoj.gov

Dated September 17, 2024

*Attorneys for Defendant*

## TABLE OF CONTENTS

PAGE

DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR
JUDGMENT UPON AGENCY RECORD .................................................................... 1

STATEMENT PURSUANT TO RULE 56.2.................................................................... 2

    I.     Administrative Determination Under Review ....................................... 2

    II.    Issue Presented for Review ..................................................................... 2

STATEMENT OF FACTS ............................................................................................. 2

    I.     Scope of the Aluminum Extrusion *Orders* ........................................... 3

    II.    History of the Finished Heat Sink Exclusion ....................................... 4

    III.   Relevant Scope Determinations ............................................................ 7

         A.    ECCO Heat Sinks For LED Light Bars .................................... 7

         B.    Agilent Technologies' Mass Filter Radiator ............................ 8

    IV.   Merchandise Subject to the Scope Inquiry ........................................... 9

    V.    The Scope Inquiry .................................................................................. 9

SUMMARY OF THE ARGUMENT ............................................................................12

ARGUMENT ...............................................................................................................13

    I.     Standard of Review ...............................................................................13

    II.    Legal Framework for Scope Rulings ...................................................14

    III.   Commerce's Determination That Wagner's Part Number 805-324 Is
         Subject To The *Orders* Is Supported By Substantial Evidence And In
         Accordance With Law ...........................................................................16

         A.    Wagner Failed To Demonstrate That Part Number 805-324 Is A
             Fabricated Heat Sink Made From Aluminum Extrusions, The First
             Criterion ...................................................................................17

B.    Wagner Failed To Produce Evidence That Part Number 805-324 Met The Second Criterion: That It Had Specified Thermal Performance Requirements .......................................................................................20

C.    For The Third And Fourth Criteria, Wagnar Did Not Demonstrate That Part Number 805-324's Design And Production Were Organized Around Meeting Specified Thermal Performance Requirements .............24

D.    Commerce Reasonably Found That, Based On The Record, Part Number 805-324 Was Not Tested To Comply With Specified Thermal Performance Requirements, The Fifth Criterion......................................28

CONCLUSION ............................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                                        <u>PAGE(S)</u>

*Agilent Techs. v. United States*,
 256 F. Supp. 3d 1338 (Ct. Int'l Trade 2017).................................................................8, 30

*Agilent Techs. v. United States*,
 335 F. Supp. 3d 1347 (Ct. Int'l Trade 2018)...................................................................passim

*Aluminum Extrusions Fair Trade Commission v. United States*,
 968 F. Supp. 2d 1244 (Ct. Int'l Trade 2014)...........................................................................19

*Am. Silicon Techs. v. United States*,
 261 F.3d 1371 (Fed. Cir. 2001).................................................................................................14

*Consol. Edison v. NLRB*,
 305 U.S. 197 (1938)..................................................................................................................14

*Crawfish Processors Alliance v. United States*,
 483 F.3d 1358 (Fed. Cir. 2007).................................................................................................14

*Goldilink Indus. Co. v. United States*,
 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)...........................................................................14

*King Supply Co., LLC v. United States*,
 674 F.3d 1343 (Fed. Cir. 2012)...........................................................................................14, 20

*Meridian Prods., LLC v. United States*,
 851 F.3d 1375 (Fed. Cir. 2017)..................................................................................14, 15, 23

*Nippon Steel v. United States*,
 458 F.3d 1345 (Fed. Cir. 2006).................................................................................................14

*Qingdao Sea-Line Trading Co. v. United States*,
 766 F.3d 1378 (Fed. Cir. 2014).................................................................................................22

*Saha Thai Steel Pipe Pub. Co. v. United States*,
 101 F.4th 1310 (Fed. Cir. 2024)........................................................................................passim

*Sango Int'l L.P. v. United States*,
 484 F.3d 1371 (Fed. Cir. 2007).................................................................................................15

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*,
 776 F.3d 1351 (Fed. Cir. 2015).................................................................................................14

## STATUTES

19 U.S.C. § 1516a(a)(2)(B)(vi) ............................................................................13,14

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................................14

## REGULATION

19 C.F.R. § 351.225 .............................................................................................13, 14

19 C.F.R. § 351.225(a) ..............................................................................................15

19 C.F.R. § 351.225(d) ..............................................................................................15

19 C.F.R. § 351.225(k)(1) ....................................................................................passim

19 C.F.R. § 351.225(k)(1)(i) ......................................................................................16

## OTHER ADMINISTRATIVE DETERMINATIONS

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*,
   86 Fed. Reg. 52,300 (Dep't of Commerce Nov. 20, 2021) ....................................................15

*Certain Aluminum Extrusions from China*, Investigation Nos.
   701-TA-475 and 731-TA-1177 (Final), Pub. 4229 (May 2011)................................................4

*Aluminum Extrusions from the People's Republic of China:  Antidumping Duty Order*,
   76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011)................................................passim

*Aluminum Extrusions from the People's Republic of China:  Countervailing Duty Order*,
   76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011)................................................passim

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| _____ )  | | |
| WAGNER SPRAY TECH., CORP.,  | )  | |
| | )  | |
| *Plaintiff*,  | )  | |
| | )  | |
| v.  | )  | Court No. 23-00241 |
| | )  | |
| UNITED STATES,  | )  | |
| | )  | |
| *Defendant*,  | )  | |
| | )  | |
| and  | )  | |
| | )  | |
| ALUMINUM EXTRUSIONS FAIR TRADE  | )  | |
| COMMITTEE,  | )  | |
| | )  | |
| *Defendant-Intervenor*.  | )  | |
| _____ )  | | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR JUDGMENT UPON AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, Wagner Spray Technology Corporation (Wagner).  *See* Wagner's Motion for Judgment On The Agency Record, ECF No. 23 (Ct. Int'l Trade May 29, 2024) (Wagner Br.).  Wagner challenges the United States Department of Commerce's final scope ruling that the extruded aluminum manifold with part number 805-824 is within the scope of the antidumping duty (AD) and countervailing duty (CVD) orders covering aluminum extrusions from the People's Republic of China (China).  *See Aluminum Extrusions from the People's Republic of China:  Antidumping Duty Order*, 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011) (*AD Order*); *Aluminum Extrusions from the People's Republic of China:  Countervailing Duty Order*, 76 Fed. Reg.

30,653 (Dep't of Commerce May 26, 2011) (*CVD Order*) (collectively, *Orders*).  Commerce's

determination is supported by substantial evidence and is in accordance with the law.

Accordingly, we respectfully request that the Court deny Wagner's motion, sustain Commerce's

determination, and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**IV.    Administrative Determination Under Review**

The administrative determination under review is "Aluminum Extrusions from the

People's Republic of China:  Final Scope Ruling on Wagner Finished Heat Sink Manifold"

(October 17, 2023) (Final Scope Ruling) (P.R. 30).[1]

**V.    Issue Presented for Review**

Whether Commerce's Final Scope Ruling pursuant to 19 C.F.R. § 351.225(k)(1) finding

that Wagner's extruded aluminum manifold with part number 805-324 does not meet the

exclusion criteria to qualify as a finished heat sink—and is thus subject to the scope of the

*Orders*—is supported by substantial evidence and in accordance with law.

**STATEMENT OF FACTS**

On May 26, 2011, Commerce issued antidumping and countervailing duty orders on

aluminum extrusions from China.  *See generally*, *Orders*.  The *Orders* cover "aluminum

extrusions which are shapes and forms, produced by an extrusion process."  *AD Order*, 76 Fed.

Reg. at 30,650.  On November 22, 2022,[2] Wagner submitted a scope ruling request, requesting

---

[1] "P.R." refers to documents from the public record.  "C.R." refers to documents from the confidential record.  For ease of reference, the record cites refer to documents filed under the antidumping duty case number, A-570-967; duplicate documents were filed under the countervailing duty case number, C-570-968.  Similarly, because the scope language of the two orders is identical, references to the scope language is to the language in the antidumping duty order.

[2] Because the Scope Ruling Request was submitted after close of business on November 21, 2022, we have considered it officially filed on November 22, 2022.

that Commerce determine that part number 805-824—described in the request as a heat sink manifold—is outside the scope of the *Orders*.  Wagner Letter, "Wagner Spray Tech Corporation Scope Ruling Application:  Finished Heat Sink Manifold, Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China, A-570-967/C-570-968" (Nov. 21, 2022) (Scope Ruling Request) (P.R. 1, C.R. 1-2).  On October 17, 2023, Commerce determined that part number 805-824 is covered by the scope of the *Orders*.  Final Scope Ruling at 1.

**VI.    Scope of the Aluminum Extrusion *Orders***

The relevant scope of the *Orders* is as follows:

The merchandise covered by the Orders is aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents).  Specifically, the subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 1 contains not less than 99 percent aluminum by weight.  The subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 3 contains manganese as the major alloying element, with manganese accounting for not more than 3.0 percent of total materials by weight.  The subject merchandise is made from an aluminum alloy with an Aluminum Association series designation commencing with the number 6 contains magnesium and silicon as the major alloying elements, with magnesium accounting for at least 0.1 percent but not more than 2.0 percent of total materials by weight, and silicon accounting for at least 0.1 percent but not more than 3.0 percent of total materials by weight.  The subject aluminum extrusions are properly identified by a four-digit alloy series without either a decimal point or leading letter.  Illustrative examples from among the approximately 160 registered alloys that may characterize the subject merchandise are as follows:  1350, 3003, and 6060.

Aluminum extrusions are produced and imported in a wide variety of shapes and forms, including, but not limited to, hollow profiles, other solid profiles, pipes, tubes, bars, and rods.  Aluminum extrusions that are drawn subsequent to extrusion (drawn aluminum) are also included in the scope.

Aluminum extrusions are produced and imported with a variety of finishes (both coatings and surface treatments), and types of fabrication.  The types of coatings and treatments applied to subject aluminum extrusions include, but are not limited to, extrusions that are mill finished (*i.e.*, without any coating or further finishing),

brushed, buffed, polished, anodized (including brightdip anodized), liquid painted, or powder coated.  Aluminum extrusions may also be fabricated, *i.e.*, prepared for assembly.  Such operations would include, but are not limited to, extrusions that are cut-to-length, machined, drilled, punched, notched, bent, stretched, knurled, swedged, mitered, chamfered, threaded, and spun.  The subject merchandise includes aluminum extrusions that are finished (coated, painted, etc.), fabricated, or any combination thereof. . . .

Subject extrusions may be identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or heat sinks (that do not meet the finished heat sink exclusionary language below).  Such goods are subject merchandise if they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation.  The following aluminum extrusion products are excluded:  aluminum extrusions made from aluminum alloy with an Aluminum Association series designations commencing with the number 2 and containing in excess of 1.5 percent copper by weight; aluminum extrusions made from aluminum alloy with an Aluminum Association series designation commencing with the number 5 and containing in excess of 1.0 percent magnesium by weight; and aluminum extrusions made from aluminum alloy with an Aluminum Association series designation commencing with the number 7 and containing in excess of 2.0 percent zinc by weight. . . .

{…}

Also excluded from the scope of these Orders are finished heat sinks.  Finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements.

{…}

*AD Order*, 76 Fed. Reg. at 30,650–51; *CVD Order*, 76 Fed. Reg. at 30,6053–54.

## VII.    History of the Finished Heat Sink Exclusion

On May 13, 2011, the International Trade Commission (ITC) notified Commerce of its

affirmative finding of injury with respect to imports of "certain aluminum extrusions from China,

other than finished heat sinks," and its negative finding of injury with respect to imports of

"finished heat sinks" from China.  *See Certain Aluminum Extrusions from China*, Investigation

Nos. 701-TA-475 and 731-TA-1177 (Final), Pub. 4229 (May 2011) (ITC Final Report).[3]  As a

---

[3] Included in exhibit 4 of the Scope Ruling Request.  P.R. 1; C.R. 1.

result, Commerce revised the scope of the subject merchandise stated in the Final Determinations

that it would exclude finished heat sinks, and, thereby, conform to, and be coterminous with, the

ITC's industry and injury determinations.  Final Scope Ruling at 5.  The ITC described heat sinks

"as a subset of aluminum extrusions typically used in electronic equipment as a thermal

controlling tool and stated that they are usually referred to as:  (1) heat sinks blanks; (2)

fabricated heat sinks; or (3) finished heat sinks."  *Id*.; *see AD Order*, 76 Fed. Reg. at 30,650 and

*CVD Order*, 76 Fed. Reg. at 30,653.  Moreover, the ITC described heat sinks as follows:

> A heat sink is a finished good made of extruded aluminum that cools a solid
> material, principally electronics and computer equipment (servers, laptops, etc.),
> by transferring the heat generated in such devices to a fluid medium, such as air or
> a liquid.  Manufacturers of electronics and computer equipment have precise
> mechanical and thermal resistance requirements that must be met by heat sink
> suppliers to ensure that their electronic products do not overheat.  The heat sink
> length is cut from an aluminum extrusion blank that is designed to the shape and
> thermally engineered to the specifications required of the heat sink application.

*Id.*  Additionally, the ITC explained that finished heat sinks are produced with "specific and

precise tolerances"; "{t}he flat surface tolerance for {finished heat sink} is often 1/1000 of an

inch per inch, compared to 4/1000 to 14/1000 of an inch per inch for ordinary aluminum

extrusions."  *Id.*  The ITC also stated that the flatness allows close contact, reducing heating-

trapping.  *Id.*

The ITC further explained that finished heat sinks are distinguishable from other

aluminum extrusions because,

> {T}he customized thermal resistance properties of {finished heat sink}; the
> unique aspects of the design, testing and production of {finished heat sinks};
> differences between {finished heat sinks} and other aluminum extrusions in the
> channels of trade through which they are sold; evidence that the thermal
> management industry is perceived by producers and customers as being different
> from the general aluminum extrusions industry; and the fact that {finished heat
> sinks} are sold at much higher prices because of high value-added than most other
> aluminum extrusions.

ITC Final Report at 9. The ITC's principal requirement for a product at issue to be classified as a finished heat sink is that the product has, and is tested to function within, specified thermal resistance parameters. *Id.* at 6–8.

In light of the ITC's negative injury finding, Commerce revised the scope of the subject merchandise by adding the finished heat sink exclusion. Specifically, Commerce added the following language to the *Orders*: "Also excluded from the scope of this order are finished heat sinks. Finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,6053.

Commerce also adopted the definitions for "heat sink blanks" and "fabricated heat sinks" used by the ITC during its injury investigation. Thus, for purposes of the proceedings, Commerce defined "heat sink blanks" as "full length aluminum extrusions used to produce finished heat sinks" which are "generally the pre-fabricated, pre-tested inputs in the production of heat sinks (post any stretching or aging processes applied)." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,6053; *see also* ITC Final Report. Commerce defined "fabricated heat sinks" as "any heat sink blank that has been cut-to-length, precision machined, and or otherwise fabricated to the end product specifications, but not yet tested, assembled onto other materials, or packaged." *AD Order*, 76 Fed. Reg. at 30,650; *CVD Order*, 76 Fed. Reg. at 30,6053. Commerce further explained that "{f}inished heat sinks differ from fabricated heat sinks in that they have been fully, albeit not necessarily individually, tested and assured to

comply with the required thermal performance end-use specifications" and that "{o}nly finished heat sinks are excluded from the scope of the order." *Id.*

## VIII.    Relevant Scope Determinations

In making the scope ruling at issue here, Commerce determined that two prior scope determinations were relevant to its analysis of Wagner's part number 805-824 because they involved interpreting whether inquiry merchandise met the terms of the finished heat sink exclusion.

### C.    ECCO Heat Sinks For LED Light Bars

The product at issue in the LED Light Bars Scope Ruling was "heat sinks for bars of LED emergency lights designed to be mounted to the roof of the vehicle" and house the lights. *See* Scope Ruling Request at Exh. 5 (Commerce Letter, "Final Scope Ruling on ECCO's Heat Sinks for LED Light Bars" (Nov. 24, 2014) (ECCO Final Scope Ruling)).  Commerce found that ECCO's product at issue failed to meet the finished heat sink exclusion because "ECCO failed to identify the specific thermal performance requirements that the products at issue are intended to meet anywhere on the record," and "ECCO did not identify the target thermal resistance that the products at issue are designed to meet, nor did it provide any evidence showing how or why the design and production of the product was organized to meet the cooling requirements of the specific electronic devices in the LED light bar." *Id*. at 17–22.  Moreover, Commerce determined that ECCO failed to demonstrate how the product at issue was "fully, albeit not necessarily individually, tested to comply with specified thermal performance requirements." *Id*. at 22.

**D.** **Agilent Technologies' Mass Filter Radiator**

Agilent Technologies (Agilent) produced a solid aluminum extrusion called a mass filter radiator, the product at issue, that was used in mass spectroscopy instruments made exclusively by Agilent.  *See* Scope Ruling Request at Exh. 6 (Commerce Letter, "Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on Agilent Technologies, Inc.'s Mass Filter Radiator," 6 (Aug. 10, 2016) (Agilent Final Scope Ruling)); *Agilent Techs. v. United States*, 256 F. Supp. 3d 1338, 1340 (Ct. Int'l Trade 2017) (*Agilent I*) (observing that the mass filter radiator is a component uniquely "designed and fabricated for use in Agilent's mass spectrometer.").  Commerce found that Agilent provided insufficient evidence to prove that the mass filter radiator was designed to meet specific thermal requirements required for the finished heat sink exclusion of the *Orders*. Agilent Final Scope Ruling at 23.

The Court held that Commerce's explanation for why the product at issue did not qualify for the exclusion to not be based on substantial evidence; specifically, the Court concluded that Commerce did not consider record evidence submitted by Agilent stating that the mass filter radiator was designed and tested around specific thermal performance requirements.  *Agilent I*, 257 F. Supp. 3d at 1345 ("{R}emanded for Commerce to fully address the evidence on the record relating to the applicability of the finished heat sink exclusion.").

On remand, Commerce clarified what criteria must be present for a product at issue to satisfy the finished heat sink exclusion:

(1) The product must be a fabricated heat sink made from aluminum extrusions;
(2) specified thermal performance requirements must exist;
(3) the product's design must have been organized around meeting those specified thermal performance requirements;
(4) the product's production must be organized around meeting the specified thermal performance requirements; and

(5) the product must have been fully, albeit not necessarily individually, tested to comply with the specified thermal performance requirements.

*Agilent Techs. v. United States*, 335 F. Supp. 3d 1347, 1352–53 (Ct. Int'l Trade 2018) (internal citations omitted) (*Agilent II*). Once more, the Court found that Commerce had overlooked Agilent's provided data—which potentially showed that the radiator itself was "designed, produced, and tested around a specified . . . thermal performance requirement"—and remanded the matter so Commerce could revisit its analysis. *Id.* at 1353–55. Ultimately, Commerce's scope determination was unchanged when the litigation settled. *See* Scope Ruling Request at Exh. 7 (Joint Stipulation for Entry of Judgment, *Agilent Techs. Inc. v. United States*, No. 16-00183 (Ct. Int'l Trade 2019)).

## IX.    Merchandise Subject to the Scope Inquiry

The product at issue is a manifold with part number 805-824, which Wagner states is a component of its Titan 440 paint sprayer. Scope Ruling Request at 4. The product is made of extruded aluminum, which Wagner asserts meets specifications for 6061-T6 aluminum alloy. *Id.* at 3. Additionally, Wagner claims part number 805-824 is classifiable under HTSUS subheading 8424.90.9080. *Id.* at 4. According to Wagner, the product—made of extruded aluminum— controls the flow and pressure of paint through the sprayer in addition to absorbing heat from various components of the sprayer such as the pump. *Id.* Part number 805-824 attaches to the bottom of the paint sprayer device and is exposed to the air for more effective heat dissipation. *Id.* at 5.

## X.    The Scope Inquiry

On November 21, 2022, Wagner filed a Scope Ruling Request, requesting that Commerce determine that part number 805-324—referred to as "Heat Sink Manifold" by Wagner in documents filed with Commerce and the Court—is outside the scope of the *Orders* because it

falls within the finished heat sink exclusion. *Id.* at 9. In its Scope Request, Wagner states that the part is made from extruded aluminum, which bolts to the underside of a line of paint sprayers and serves two functions: "controlling the flow of liquid paint and heat dissipation to maintain acceptable temperature of the pump and motor." *Id.* at 4. Wagner claimed that part number 805-324 is a finished heat sink because it met Underwriters Laboratories (UL) 1450 temperature requirements—which apply to paint sprayers—in terms of heat dissipating qualities, flatness, and dimensional properties. *See id.* at 16–23.

Commerce initiated its inquiry on December 22, 2022, based on Wagner's Scope Request. *See* Commerce Letter, "Initiation of Wagner Spray Tech Corporation (Wagner) Heat Sink Manifold Scope Inquiry" (Dec. 22, 2022) (P.R. 2) (Initiation Letter). Petitioner, defendant-intervenor in this proceeding, Aluminum Extrusions Fair Trade Committee (AEFTC), submitted comments on January 30, 2023, opposing Wagner's Scope Request. AEFTC Letter, "Aluminum Extrusions from the People's Republic of China Comments on Wagner's Scope Ruling Request" (Jan. 30, 2023) (P.R. 14, C.R. 3) (AEFTC Response). AEFTC made two principal arguments. First, it argued that Wagner's part number 805-324 is covered by the plain language of the *Orders* pursuant to 19 C.F.R. § 351.225(k)(1). *Id.* at 3–4. Second, AEFTC asserted that part number 805-324 is not a finished heat sink because it is instead a pump block, and any heat dissipating functions are incidental—not meeting strict thermal performance standards for the exclusion. *Id.* at 4–13. On February 21, 2023, Wagner filed rebuttal comments in response to the domestic interested party's comments. Wagner Letter, "Wagner Rebuttal Comments: Finished Heat Sink Manifold, Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China, A-570-967/C-570-968" (Feb. 21, 2023) (P.R. 17, C.R. 4) (Wagner Rebuttal Comments).

On August 24, 2023, Commerce issued a supplemental questionnaire to Wagner, Commerce Letter, "Aluminum Extrusions from the People's Republic of China:  Supplemental Questionnaire" (Aug. 24, 2023) (Supplemental Questionnaire) (P.R. 22), which Wagner responded to on September 11, 2023, Wagner Letter, "Wagner Supplemental Questionnaire Response: Finished Heat Sink Manifold, Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China, A-570-967/C-570-968" (Sept. 11, 2023) (P.R. 27, C.R. 5) (Wagner Supplemental Response).

AEFTC submitted comments on Wagner's Supplemental Response on September 25, 2023.  AEFTC Letter, "Aluminum Extrusions from the People's Republic of China: Comments on Wagner's Supplemental Questionnaire Response" (Sept. 25, 2023) (P.R. 28, C.R. 6).  In its comments, AEFTC stated that, in the supplemental response, Wagner has provided no new information; did not demonstrate that part number 805-324 is a heat sink; and even if the parts were heat sinks, Wagner has not demonstrated that they are finished heat sinks due to a continued failure to demonstrate thermal performance requirements.  *Id.* at 2–12.

On October 11, 2023, Wagner submitted rebuttal comments in response to the domestic interested party's comments. Wagner Letter, "Wagner Rebuttal Comments: Wagner Heat Sink Manifold, Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China, A-570-967/C-570-968" (Oct. 11, 2023) (P.R. 29) (Wagner Supplemental Rebuttal Comments).

On October 17, 2023, Commerce issued its Final Scope Ruling and concluded that part number 805-324 is covered by the scope of the *Orders*.  Final Scope Ruling at 11.  Further, Commerce concluded that Wagner's product did not meet the requirements of the *Orders'* finished heat sink exclusion.  *Id.* at 15.  Commerce examined the scope of the *Orders* and the

description of the product contained in Wagner's Scope Request (including pictures and schematics that Wagner provided) and relied on interpretive sources set forth in 19 C.F.R. § 351.225(k)(1) for its analysis.  *Id.*

Upon examining the evidence and (k)(1) interpretive sources—primarily, two of its previous scope rulings and ITC language concerning finished heat sinks—Commerce determined that (k)(1) sources were dispositive in determining that the subject merchandise is not excluded from the scope of the *Orders*.  *Id.* at 15.  Specifically, although part number 805-324 has some of the same functions and features as a fabricated heat sink, its primary purpose is controlling paint as a pump valve.  *Id.* at 12.  Further, Commerce concluded that Wagner had not identified "thermal resistance parameters or demonstrated that part number 805-324 ha{d} been tested to comply with the specified thermal performance requirements."  *Id.* at 15.

This challenge followed.  *See* Summons, ECF No. 1 (November 17, 2023).

## SUMMARY OF THE ARGUMENT

Commerce's determination that Wagner's part number 805-324 is supported by substantial evidence and in accordance with law.  Commerce lawfully relied on (k)(1) sources and the record provided to determine that Wagner's part number 805-324 is covered by the *Orders* because it did not meet the specific requirements of the finished heat sink exclusion. Despite Wagner's assertion that part number 805-324 is a finished heat sink, Commerce correctly identified that part number 805-324's primary function is as a pump block, housing essential components of the paint sprayers that regulate the flow and pressure of paint.  Moreover, Wagner presented no evidence that part number 805-324 meets specified thermal performance requirements for heat sinks.

Wagner improperly seeks to conflate the design and testing of the downstream product, the paint sprayer, with the design and testing that a heat sink would require to qualify as a

finished heat sink.  Inclusion of part 805-234 in tests to ensure that the *downstream product* met the surface temperature and operating temperature requirements for the downstream product is not sufficient to meet the specific requirements of the finished heat sink scope exclusion. Instead, as the ITC Final Report explained, a heat sink requires that specified thermal performance requirements must exist for the inquiry merchandise and that the inquiry merchandise be tested to meet such requirements.  Moreover, Wagner failed to identify thermal thresholds specific to part number 805-324 and failed to demonstrate that this part was itself designed, produced, and tested to meet those thermal thresholds.

Although Wagner contends that its product falls plainly within the plain terms of the *Orders'* exclusions, that conclusion fails to account for clarifying (k)(1) sources that Wagner itself submitted onto the record (specifically Commerce's prior scope rulings and the ITC Final Report).  Moreover, Wagner fails to establish that Commerce's reliance on (k)(1) interpretive sources was unreasonable.  Commerce's determination that part-number 805-324 is not a finished heat sink is consistent with the ITC Final Report and prior scope rulings detailing the strict requirements for the finished heat sink exclusion.  Ultimately, Wagner does not show that Commerce misapplied any, let alone all, of the five criteria outlined in *Agilent II*.  Further, Wagner never contested the application of this test, merely the result.

## ARGUMENT

I. **Standard of Review**

The Court may review "{a} determination by {Commerce} as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order.  19 U.S.C. § 1516a(a)(2)(B)(vi).  Such a "class or kind" determination is known as a "scope ruling."  19 C.F.R. § 351.225.  When a scope ruling is "supported 'by substantial evidence on the record' and otherwise 'in accordance with

13

law'," the Court must affirm it. *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (*Meridian Prods.*) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Crawfish Processors Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938) ("Substantial evidence is more than a mere scintilla.").

Even if it is possible to draw two inconsistent conclusions from the record, "such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310, 1323 (Fed. Cir. 2024) (*Saha Thai*) (quoting *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001)). Further, "the {C}ourt may not substitute its judgment for that of the agency when the choice is between two fairly conflicting views, even though the {C}ourt would justifiably have made a different choice had the matter been before it *de novo*." *Goldilink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (internal citations omitted). A party challenging Commerce's scope ruling under the substantial evidence standard "has chosen a course with a high barrier to reversal." *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (quoting *Nippon Steel v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006)).

## II.    Legal Framework for Scope Rulings

Congress has authorized Commerce to make determinations "as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing . . . order." 19 U.S.C. § 1516a(a)(2)(B)(vi). Determinations concerning a particular product are made in accordance with the analytical framework and procedures set forth in Commerce's regulations. 19 C.F.R. § 351.225; *see also Shenyang Yuanda Aluminum Indus. Eng'g Co. v.*

14

*United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) ("There is no specific statutory provision governing the interpretation of the scope of {AD} or {CVD} orders."). Commerce is often called upon to determine whether a certain product is included within the scope of an order because it must write scope language in general terms. 19 C.F.R. § 351.225(a); *see Meridian Prods.*, 851 F.3d at 1379.

Under the regulations, Commerce examines the scope language of the order at issue and the description of the product contained in the scope ruling application. 19 C.F.R. § 351.225(k)(1). At its discretion, Commerce may also consider primary interpretive sources. 19 C.F.R. § 351.225(k)(1). These primary sources (frequently referred to as "(k)(1)" sources/materials) include the petition pertaining to the order at issue, previous determinations by Commerce (including prior scope determinations), ITC reports pertaining to the order at issue, and any other relevant record evidence. *Id.* "{T}he regulations at least *permit*, if not mandate, Commerce to consider the (k)(1) materials." *Saha Thai*, 101 F.4th at 1326 (emphasis in original). "Practically, because the scope language is necessarily written in general terms, Commerce will *likely* consider the (k)(1) materials to assist in understanding the meaning of the scope language relevant to the determination of whether a particular product is within the scope." *Id.* at 1329 (citing *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,323 (Dep't of Commerce Nov. 20, 2021) (*2021 Revised Regulations*)) (emphasis in original). Further, when parties "explicitly rely on the (k)(1) materials for their contradictory interpretation of an order, Commerce cannot arbitrarily ignore those arguments and evidence on the record." *Id.* at 1328. If Commerce determines that these sources are dispositive, it will issue a final scope ruling as to whether the merchandise is covered by the order or orders. 19 C.F.R. § 351.225(d); *see Sango Int'l L.P. v. United States*, 484

F.3d 1371, 1379 (Fed. Cir. 2007) (recognizing that (k)(1) sources are dispositive when they "definitely answer the scope question.").

### III.    Commerce's Determination That Wagner's Part Number 805-324 Is Subject To The *Orders* Is Supported By Substantial Evidence And In Accordance With Law

Commerce's determination that Wagner's part number 805-324 is subject to the *Orders* is reasonable and supported by substantial evidence. Pursuant to 19 C.F.R. § 351.225(k)(1)(i), Commerce correctly determined that the descriptions of the product, the scope language, and prior rulings are, together, dispositive as to whether Wagner's part-number 805-324 is within the scope of the *Orders*. Final Scope Ruling at 10. Further, Commerce correctly determined that Wagner's part number 805-324 failed to meet the criteria for the "finished heat sink" exclusion as outlined in the scope of the *Orders*. *Id*.; *see also Orders,* 76 Fed. Reg. at 30,651.

In the underlying inquiry, Commerce considered whether Wagner's part number 805-324 met the requirements of the 'finished heat sink' scope exclusion. Final Scope Ruling at 11. Commerce recognized that "{t}he scope language states that 'finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements." *Id*.; *see Orders,* 76 Fed. Reg. at 30,651. For a product to be considered a finished heat sink excluded from the *Orders*, petitioning parties have the burden to show that the product at issue satisfies all five criteria: (1) the product must be a fabricated heat sink made from aluminum extrusions; (2) specified thermal performance requirements must exist; (3) the product's design must have been organized around meeting those specified thermal performance requirements; (4) the product's production must be organized around meeting the specified thermal performance requirements; and (5) the product must have been fully, albeit not necessarily individually, tested to comply

16

with the specified thermal performance requirements.  *See* Final Scope Ruling at 11; *see also*

*Agilent II*, 335 F. Supp. 3d at 1352–53.[4]  Wagner incorrectly asserts that Commerce erred in its

analysis and Final Scope Ruling.  Specifically, Wagner argues, contrary to Commerce's findings,

that part number 805-324 meets each of the five requirements to qualify for a finished heat sink

exclusion.  *See* Wagner Br. at 18-29.  Wagner's arguments misapprehend Commerce's

determination or lack merit, and as set forth below, Commerce's determination that part number

805-324 is covered by the scope of the *Orders* and not subject to the finished heat sink exclusion

is supported by substantial evidence and should be sustained.

### A.  Wagner Failed To Demonstrate That Part Number 805-324 Is A Fabricated Heat Sink Made From Aluminum Extrusions, The First Criterion

Wagner contends that part number 805-324 is a finished heat sink made aluminum

extrusions because it possesses the same physical characteristics and conforms to the description

of a heat sink in the ITC Report.  Wagner Br. at 18-19.  In addition, Wagner argues that there is

nothing in the (k)(1) materials that states that a finished heat sink cannot have a dual purpose,

and there is no evidence that the "primary purpose" of part number 805-324 is "not that of a heat

sink." *Id.* at 19-20.  Wagner's contentions are incorrect.

First, Commerce considered whether the inquiry merchandise is a "fabricated heat sink

made from aluminum extrusions." *Id.*  The *Orders* state that a "{f}abricated heat sink{} {is}

generally understood to be any heat sink blank that has been cut-to-length, precision machined,

and/or otherwise fabricated to the end product specifications, but not yet tested, assembled onto

---

[4] Wagner does not argue that Commerce erred in using the five criteria established
*Agilent II* to determine whether a product is a finished heat sink or that the criteria are unlawful.
*See* Wagner Br. at 18 ("While the criteria that Commerce used to analyze whether Wagner's heat
sink manifold fell within the exclusion was reasonable, Commerce's analysis of the record
evidence and whether the criterion were met was not.").  Accordingly, the Court need consider
only whether Commerce's analysis of the record is supported by substantial evidence.

other materials, or packaged." *Orders*, 76 Fed. Reg. at 30,650. In addition, the ITC Final Report

provides that "finished heat sinks 'are designed to remove the damaging heat from electronic

equipment' and 'are different from most other aluminum extrusion … by virtue of the specific

and precise tolerances to which they are generally produced." ITC Final Report at 7; Final

Scope Ruling at 12. The ITC also explained that finished heat sinks are different from other

aluminum extrusions:

> The flat surface tolerance for {heat sinks} is often 1/1000 of an inch per inch,
> compared to 4/1000 to 14/1000 of an inch per inch for ordinary aluminum
> extrusions. The precise flatness of {heat sinks} allows for close contact between
> the {heat sink} and the heat-generating components for which they have been
> designed and to which they are attached, thereby reducing or eliminating heat-
> trapping dead air.

ITC Final Report at 7.

The record demonstrates that Wagner's part number 805-324 is fabricated using computer

numerical control (CNC) processing from an extruded aluminum blank "with dimensions held to

high tolerances and stringent quality standards" and has "two main purposes – controlling the

flow of liquid paint and heat dissipation to maintain acceptable temperature of the pump and

motor." Scope Ruling Request at 4-5; Final Scope Ruling at 12. Further, evidence demonstrates

that part number 805-324 functions as housing for essential components within a paint sprayer

that "'control the flow and operating pressure … to spray a consistent spray pattern' in addition

to pulling 'heat away from the mechanical action' of those essential components." Final Scope

Ruling at 12; *see also* Scope Ruling Request at 5. Finally, Wagner provided evidence that the

mounting surface of part number 805-324 has a flat surface tolerance of 3/1000 of an inch for the

total machined surface, and 1/1000 of an inch for the flat surface finish. Scope Ruling Request

at 3.

Although the record demonstrates that Wagner designed and produced part number 805-324 to meet similar flat surface tolerances used by fabricated heat sinks, this alone is not dispositive as to whether the inquiry merchandise is a fabricated heat sink. *See* Final Scope Ruling at 12; ITC Final Report at 7; *Agilent II*, 335 F. Supp. 3d at 1352–53. Wagner detailed that it produced the product at issue from aluminum because of the material's "high yield strength, corrosion resistance, and low density compared to other materials such as steel," not because of its heat reduction properties. Scope Ruling Request at 5. Also, the downstream product's owner's manual labels part number 805-324 as the "pump block," responsible for housing key components responsible for regulating the flow of paint, namely a valve stem, cam base, and valve handle, and makes no mention of this part functioning as a heat sink or having thermal reduction properties. *See* AEFTC Response at 4-5, and Exh. 1[5]; *see also* Final Scope Ruling at 12. As a result, Commerce reasonably determined that Wagner failed to demonstrate that part number 805-324 satisfies the first requirement of the scope exclusion: that the product is a "fabricated heat sink made from aluminum extrusions." Final Scope Ruling at 12.

Further, Wagner relies on *Aluminum Extrusions Fair Trade Comm.*, to discuss the ITC's apparent focus on physical properties when detailing what is a heat sink. Wagner Br. at 20 (discussing the ITC Final Report's interpretation of the scope exclusion); *see Aluminum Extrusions Fair Trade Commission v. United States*, 968 F. Supp. 2d 1244, 1252 (Ct. Int'l Trade 2014). Despite observing that heat sinks have "thermal resistance properties . . . intended to meet specific needs," *i.e.* specified thermal performance parameters, Wagner fails to show such properties or parameters exist for part number 805-324. Wagner Br. at 20. Instead, evidence demonstrates that any heat-dissipating properties of part number 805-324 are incidental to its

---

[5] The owner's manual included in exhibit 1 of the AEFTC Response. P.R. 14; C.R. 3.

primary purpose of controlling the flow of paint.  Final Scope Ruling at 12; *see* AEFTC

Response at Exh. 1; Scope Ruling Request at 5.

Commerce examined evidence on the record that suggested that part number 805-324

"had some of the same functions and features as a fabricated heat sink," namely its specifications

for flatness.  Final Scope Ruling at 12.  However, Commerce exercised its expertise to determine

that part number 805-324 primarily was a pump valve.  *Id.*  At best, Wagner is disagreeing with

Commerce's view of record evidence, which is not sufficient to undermine Commerce's

findings.  *See Saha Thai*, 101 F.4th at 1322-23; *see also King Supply*, 674 F.3d at 1348 ({T}he

meaning and scope of antidumping orders are issues 'particularly within the expertise' and

'special competence of Commerce.'").  Thus, Commerce reasonably determined that part

number 805-324 is not a fabricated heat sink.

### B. Wagner Failed To Produce Evidence That Part Number 805-324 Met The Second Criterion: That It Had Specified Thermal Performance Requirements

For the second factor, Wagner asserts that part number 805-324 has specific thermal

performance requirements because it conforms with the thermal requirements of the UL 1450

temperature test requirements (the standards for motor-operated air compressors, vacuum pumps,

and painting equipment).  *See* Wagner Br. at 21-25.  Wagner contends that Commerce

unlawfully limited the exclusion because the ITC Final Report states that only finished heats

sinks are "*characterized* by their thermal resistance properties" and thus, Wagner's part number

805-324 must simply have sufficient thermal resistance properties to cool the motor, PC Board,

and sprayer, to their desired threshold temperatures.  *See id.*  Wagner also argues that it is

unreasonable for Commerce to require excluded heat sinks to have a "certification" for thermal

resistance.  *See id.*  Each of Wagner's assertions fails.

Commerce considered whether specified thermal performance requirements existed for Wagner's part number 805-324.  *See* Final Scope Ruling at 12-13.  The Final ITC Report explains that "that finished heat sinks 'differ from other aluminum extrusions (including heat sinks that are not 'finished') because of their customized thermal resistance properties,' and that finished heat sinks 'are certified to perform within thermal resistance parameters.'"  Final Scope Ruling at 12 (citing Scope Ruling Request at Exhibit 4, containing ITC Final Report at 7-9).  Moreover, the ITC also explained that the thermal resistance properties of finished heat sinks are "precisely or optimally suited to cool the specific electronic devices for which they have been designed."  *Id*.

During the review, Wagner stated that part number 805-324 conformed with the UL 1450 temperature test requirements and provided a copy of UL 1450, which the record indicates is the "standard for safety" for motor-operated air compressors, vacuum pumps, and painting equipment.  Scope Ruling Request at 17 and Exh. 8; *see* Wagner Supplemental Questionnaire Response at 7 ("As noted, contained within the UL 1450 standard are the temperature standards for the individual electrical components under UL746C.  The heat sink manifold is tested to achieve these temperatures.").  Wagner provided information that indicated that UL 1450 requires that the paint sprayer operate at a temperature under 125 degrees Celsius and that the only component that reduces the overall heat of the paint sprayer is part number 805-324.  *See* Wagner Supplemental Questionnaire Response at 1; *see also* Final Scope Ruling at 13.  In addition, Wagner indicated that the PC board and motor in the paint sprayer must comply with the temperature requirements in UL 746C, which is included within UL 1450.  *Id*.; *see also* Scope Ruling Request at Exh. 3 at 12 ("UL 746C relates to Polymeric Materials - Use in Electrical Equipment Evaluations.").

21

However, the inquiry merchandise is part number 805-324, not the paint sprayer, the downstream product incorporating the part.  Commerce determined that Wagner failed to demonstrate that specified thermal performance requirements existed for the product at issue in this scope inquiry—part number 805-324.  Final Scope Ruling at 13.  Although Wagner demonstrated that standards for safe operating temperatures exist for the *downstream product* (*i.e.*, the paint sprayer) and for *other components* of the downstream product (*i.e.*, PC board and motor), it did not establish that any heat sink thermal standards exist for, or apply to, part number 805-324.  *Id.*  Rather, Wagner stated that the "thermal performance requirements of {part number 805-324} are tied to the performance components that the {part number 805-324} is designed for."  Wagner Supplemental Questionnaire Response at 1.

Commerce reasonably determined that "the thermal performance of part number 805-324 being 'tied to' the operating temperature standards for the downstream product is not sufficient to meet the specific requirements of the finished heat sink scope exclusion, which requires that specified thermal performance requirements must exist for the inquiry merchandise."  Final Scope Ruling 13.  Because finished heat sinks must be "certified to perform within thermal resistance parameters," *see* ITC Final Report at 7-9, and Wagner failed to provide specific certified thermal resistance parameters or specified thermal performance requirements for part number 805-324, Commerce determined that Wagner failed to satisfy the second criterion of the finished heat sinks exclusion, *see* Final Scope Ruling at 13; *see also Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (*Qingdao*) ("The burden of creating an adequate record lies with the interested parties, not with Commerce.).

Wagner challenges Commerce's interpretation of the ITC Final Report's certification requirement, asserting that there is no explanation in the ITC Final Report what the certification

must entail.  Wagner Br. at 24.  However, in the ITC Final Report—which Wagner relies on in

its justification for this omission—for the inquiry merchandise to be a finished heat sink, it must

be "certified to perform within thermal resistance parameters."  ITC Final Report at 7; *see Saha*

*Thai*, 101 F.4th at 1326 (Commerce has discretion to interpret (k)(1) sources and to determine

whether the sources "answer the scope question.").  The ITC Final Report makes clear that, for

inquiry merchandise, certification is explicitly necessary.  *See* ITC Final Report at 7.  Any such

certification is absent from the record.  *See generally*, Scope Ruling Request; Rebuttal

Comments; Supplemental Response; Wagner Supplemental Rebuttal Response; *accord*,

Supplemental Questionnaire at 4 (requesting that Wagner provide certification to comply with

the "ITC Final Report, which {Wagner} submitted in Exhibit 4 of {their} Scope Request.").

Wagner has provided performance standards and testing results for only the downstream

product—the paint sprayer—not the inquiry merchandise: part number 805-324.  *See*

Supplemental Response 1–3.  Commerce cannot decide in Wagner's favor when Wagner fails to

build a record that supports its claim.

Finally, Wagner's citation to *Meridian Prod.*, *see* Wagner Br. at 25, demonstrates that

Commerce determines the scope of the *Orders*, not Wagner, and "Commerce's analysis of these

sources against the product in question produces factual findings reviewed for substantial

evidence."  *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017)

(*Meridian Prod.*).  Commerce's final scope ruling explains that Wagner failed to file the required

certified thermal resistance parameters to show whether part number 805-324 met the second

criteria.  Final Scope Ruling at 13.  Because evidence to show a specified thermal performance

requirement does not exist on the record, Wagner failed to carry its burden to satisfy the second

criterion of the heat sink exclusion.

**C. For The Third And Fourth Criteria, Wagnar Did Not Demonstrate That Part Number 805-324's Design And Production Were Organized Around Meeting Specified Thermal Performance Requirements**

For the third criterion of the finished heat sinks exclusion, a product's design must have been organized around meeting specified thermal performance requirements. *Agilent II*, 335 F. Supp. 3d at 1353. To determine whether a product's design was organized around meeting specified thermal performance requirements, the ITC determined that "{s}pecialized equipment, including wind tunnels, flow calibration equipment, testing equipment, and specialized design and data collection software are used to design {finished heat sinks} and to produce prototypes." ITC Final Report at 8; Final Scope Ruling at 13. Moreover, "{h}ighly trained employees manage the {finished heat sink} design and testing equipment." *Id.*

At the same time, the fourth criterion requires that a product's production must have been organized around meeting specified thermal performance requirements. *Agilent II*, 335 F. Supp. 3d at 1353. In the ITC's Final Report, the ITC stated that "finished heat sinks are 'produced from aluminum extrusions in a process in which a cut part of an extrusion is held in and fabricated by a computer controlled milling machine to add holes, clearance pockets, and attachment points of heat generating devices.'" ITC Final Report at 8; Final Scope Ruling at 14. Further, the ITC found that "after machining, the part is 'cleaned and deburred …{and may} have one of a variety of finishes applied to it,'" that specialized equipment, specialized design, and data collection software are used to produce prototypes, and that substantial thermal analysis is associated with the front end of finished heat sink production. Final Scope Ruling at 14; *see* ITC Final Report at 8.

Wagner erroneously argues that the design and the production for part number 805-324 were organized around the requisite thermal standards. *See* Wagner Br. at 25-28. In particular,

Wagner alleges that Commerce was overly focused on language in the ITC Final Report that "{s}pecialized equipment, including wind tunnels, flow calibration equipment, testing equipment, and specialized design and data collection software are used to design {finished heat sinks} and to produce prototypes." Wagner Br. at 26. Instead, Wagner emphasizes that this definition relates to only prototypes. *Id.* ("these items relate solely to the design phase and creation of prototypes."). Next, Wagner argues that "there is no indication in the report that this is the *only* manner in which {finished heat sinks} can be designed" and that the shape, size and flatness should be considered. Wagner Br. at 27. Wagner's argument misapplies the ITC Final Report overly narrowly and omits critical criteria to qualify as a finished heat sink.

The record demonstrates that, in the development stage, Wagner tests the prototype PC board and motor components of the paint sprayer for maximum operating temperatures, which it compares to the UL standards for those components. *See* Wagner Supplemental Questionnaire Response at 2; Final Scope Ruling at 13. Further, Wagner explains that it then uses these prototype test results for the design of part number 805-324 to achieve the UL requirements. *Id.* Accordingly, Wagner asserts that "'the difference in the operating temperature and the UL thermal requirements is the amount of heat that {part number 805-324} must diffuse or 'pull away' from the electrical components,'" and Wagner makes changes to "part number 805-324 based on actual test results, and then the paint sprayer and components are tested again until the temperatures are within the UL 1450 requirements." Wagner Supplemental Questionnaire Response at 2-3; Final Scope Ruling at 13-14. Thereafter, Wagner states that certain aspects of the size, mass, surface area, surface finish, and material selection achieve the operating temperatures specified in UL 1450 (for motor-operated air compressors, vacuum pumps, and

painting equipment).  Final Scope Ruling at 13-14; *see* Wagner Supplemental Questionnaire Response at 2-6.

Further, Wagner proffered that part number 805-324 is produced to comply with UL 1450 standards (for motor-operated air compressors, vacuum pumps, and painting equipment) and chose to make the part with T6 aluminum alloy due to its "industry-controlled specifications … required to achieve thermal properties, density, and specific heat capacity of the aluminum alloy."  *See* Scope Ruling Request at 3; *see also* Wagner Rebuttal Comments at Exh. 1.  Wagner also asserted that part number 805-324's flat surface tolerance is the key physical characteristic, which allows the part to achieve the necessary thermal parameters of UL 1450, and the computer numerical control (CNC) machining as the production method allows Wagner to achieve the required tight tolerances.  *See* Wagner Supplemental Questionnaire Response at 6.  Additionally, Wagner suggested that CNC machining is necessary to meet precise dimensional and flatness requirements, and "custom fixtures were built and qualified to meet dimensional machining requirements for heat sink mounting surface flatness and for surface finish for optimum thermal conductivity."  *See* Scope Ruling Request at 19.  Finally, Wagner expressed that if part number 805-324 "did not have the described material, dimensional and surface specifications, it would not be able to satisfy the UL 1450 temperature test requirements."  *Id*. at 22.

However, as established in criterion two, Commerce determined that part number 805-324 did not have specified thermal performance requirements separate from the thermal performance requirements of the PC board and motor components.  Final Scope Ruling at 14.  Because Wagner failed to demonstrate that the specified thermal performance requirements for part number 805-234 existed, Commerce found that Wagner could not demonstrate that part number 805-324's design and production were organized around meeting specified thermal

performance requirements. *See* Final Scope Ruling at 12-14. Further, Commerce found that Wagner did not identify the types of specialized equipment that the ITC described as being involved in the design of finished heat sinks, including wind tunnels, flow calibration equipment, or specialized design and data collection software. Final Scope Ruling at 14; ITC Final Report at 8; *see generally* Scope Ruling Request; *see also generally* Wagner Supplemental Questionnaire Response. Thus, there is nothing on the record to suggest how Wagner's part number 805-324 design or production was organized around meeting specified thermal performance requirements.

Wagner's assertions, that "there is no indication in the report that this is the *only* manner in which {finished heat sinks} can be designed," and "… if {finished heat sinks} can only be designed using certain methodologies then this express requirement should have been included in the scope language," overlooks Commerce's (k)(1) analysis. *See* Wagner Br. at 27. When looking at (k)(1) materials, Commerce has the discretion to interpret the ITC Final Report and to determine whether it "answer{s} the scope question." *See Saha Thai*, 101 F.4th at 1326. The exclusion language states that finished heat sinks have "the design and production of which are organized around meeting certain specified thermal performance requirements." *AD Order*, 76 Fed. Reg. at 30,651. Then, the ITC Final Report provides the necessary context, describing the specialized equipment necessary to design and produce finished heat sinks. ITC Final Report at 8. Commerce reasonably exercised its discretion to use (k)(1) material to "clarify or support Commerce's understanding of the scope language." *See Saha Thai*, 101 F.4th at 1325.

Wagner provided no evidence of the certified thermal resistance parameters or the specified thermal performance requirements for part number 805-324 and then did not demonstrate that part number 805-324's design or production was organized around meeting those specified thermal performance requirements. Final Scope Ruling at 13-15; *see* ECCO

Final Scope Ruling at 20-21.  Accordingly, Commerce reasonably concluded that Wagner's par number 805-324 does not meet the third or fourth criteria for the finished heat sink exclusion.

**D. Commerce Reasonably Found That, Based On The Record, Part Number 805-324 Was Not Tested To Comply With Specified Thermal Performance Requirements, The Fifth Criterion**

The finished heat sink scope exclusion requires that the inquiry merchandise must have been fully, albeit not necessarily individually, tested to comply with the specified thermal performance requirements.  *See Agilent II*, 335 F. Supp. 3d at 1353.  The ITC Final Report stresses that finished heat sinks have specific, identified thermal resistance properties, and the devices are tested to ensure that they function within the specified thermal resistance parameters. *See* ITC Final Report at 7-9; *see also* Final Scope Ruling at 15; ECCO Scope Ruling at 17.

Wagner provided information that its electronic testing laboratory conducted testing in 2008 to comply with UL 1450 standards related to air compressors, vacuum pumps, and painting equipment.  Wagner's Rebuttal Comments at 6-7.  But that testing was conducted on the paint sprayer to determine whether the paint sprayer complied with UL 1450.  *Id*. at 22.  Further, Wagner provided information that part number 805-324 was tested against the UL 746C standards contained within the UL 1450 regulations.  *See* Wagner Supplemental Questionnaire Response at 1 (UL 746C relates to polymeric materials - used in electrical equipment evaluations, whereas UL 1450 concerns motor-operated air compressors, vacuum pumps and painting equipment.).  Finally, Wagner stated that during this testing, "thermocouples are attached to the relevant PC board components and to the motor to determine whether {part number 805-324} is functioning at the thermal level needed."  *See* Wagner Supplemental Questionnaire Response at 7; Final Scope Ruling at 15.

In its ruling, Commerce concluded that there is insufficient evidence that part number 805-324 was fully tested to meet thermal performance requirements for finished heat sinks. Final Scope Ruling at 15.  Despite evidence that the *downstream paint sprayer* undergoes testing to comply with UL 1450 standards, which are for motor-operated air compressors, vacuum pumps, and painting equipment, Wagner did not establish that part number 805-324 was fully tested to meet thermal performance requirements specific to finished heat sinks.  *Id.*; *see* Wagner Supplemental Questionnaire Response at 7.  Thus, Commerce appropriately concluded that Wagner failed to identify the thermal resistance parameters specific to a finished heat sink or demonstrate that part number 805-324 was tested to comply with the specified thermal performance requirements.  Final Scope Ruling at 15.

Wagner now contends that part number 805-324 was tested to comply with thermal requirements, part number 805-324 is a custom product that is only produced for Wagner to work for Wagner's products, and it is not a commodity heat sink to be used with different electronical components of different customers, thereby requiring a generic resistance factor. Wagner Br. at 28-29.  However, Wagner's premise—that a unique part can only be tested along with the electrical components—is contradicted by *Aligent* and the underlying scope ruling.  *See* Agilent Final Scope Ruling at 6.  The product at issue in *Agilent* (a solid aluminum extrusion called a mass filter radiator) was uniquely designed and built to Agilent specifications and could not be used for any other purpose other than in downstream Agilent products (mass spectroscopy instruments).  *See* Agilent Final Scope Ruling at 6 ("Aligent explained … that it designs and manufactures gas chromatography mass sprectoscopy (mass spectrometer) instruments, which incorporate the {mass filter radiator}, a finished aluminum component which is manufactured from extruded aluminum.").  Despite this, Agilent specifically tested the product at issue.  *Id.*;

*Agilent I*, 256 F. Supp. 3d at 1345 (describing Agilent's declaration that provided details regarding the mass filter radiator's heat transfer properties, including the certain material specifications, required temperature changes, and thermal resistance parameters).  Like the product at issue in *Agilent*, part number 805-324 could have been tested separately from its downstream product.  *See id.*  However, unlike the product at issue in *Agilent*, it was not.  *See id.*

As explained above, the heat sink exclusion from the scope of the *Orders* was added in response to the ITC's determination that the finished heat sinks described by the ITC were not a threat or causing injury.  *See generally* ITC Final Report.  Wagner fails to recognize that the heat sink exclusion from the scope of the *Orders* is not a generic exclusion for any aluminum extrusion that dissipates heat within another product.  The exclusion is a narrow exclusion limited to heat sinks that meet all criteria specified by the ITC.

Wagner cannot show what the heat sink exclusion requires: that the product at issue was tested to meet thermal performance requirements specific to a finished heat sink.  Commerce concluded that Wagner failed to demonstrate that part number 805-324 met any of the requisite criteria, let alone all five of them.  Thus, Commerce correctly concluded that part number 805-324 does not meet the terms of the finished heat sink exclusion.  Therefore, Commerce correctly determined that Wagner's part number 805-324 is within the scope of the *Orders.*

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny the plaintiff's motion for judgment upon the administrative record and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

30

PATRICA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
Jared M. Cynamon
Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.
Telephone:  (202) 482-0131

/s/ Collin T. Mathais
COLLIN T. MATHIAS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 305-7571
Email: collin.t.mathias@usdoj.gov

Dated September 17, 2024

*Attorneys for Defendant United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the word limitation in Court of International Trade Standard Chambers Procedures § 2(B)(1), and contains approximately 8,988 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


<u>/s/ Collin T. Mathias</u>


## <u>CERTIFICATE OF SERVICE</u>

I certify under penalty of perjury that on this 17 day of September 2024, a copy of the foregoing "DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT UPON THE AGENCY RECORD" was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ Collin T. Mathias</u>
COLLIN T. MATHIAS