UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| WAGNER SPRAY TECH., CORP., | : |
| *Plaintiff*, | : |
| v. | Court No. 23-00241 |
| UNITED STATES, | : |
| *Defendant*, and | : |
| ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, | : |
| *Defendant-Intervenors*. | : |

**PLAINTIFF'S REPLY BRIEF**

Andrew T. Schutz
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

*Counsel for Plaintiffs*

Dated: November 13, 2024

**TABLE OF CONTENTS**

**INTRODUCTION** ..................................................................................................................1

**ARGUMENT** ..........................................................................................................................1

I.  **THE GOVERNMENT'S INTERPRETATION OF THE FIVE HEAT SINK EXCLUSION CRITERIA AS APPLIED TO WAGNER'S PRODUCT IS UNREASONABLE AND NOT SUPPORTED BY SUBSTANTIAL EVDIENCE**............1

    A.    **The Government Is Wrong that Wagner's Product is Not a "Fabricated Heat Sink Made From Aluminum Extrusions"** ............................................................2

    B.    **Wagner's Heat Sinks Have Specified Thermal Performance Requirements** ...........................................................................................................5

    C.    **The Government's Arguments About Design, Production and Testing Similarly Fails** ........................................................................................................9

**CONCLUSION** ....................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agilent Techs. v. United States*,
   335 F. Supp. 3d 1347 (Ct. Int'l Trade 2018) ........................................................................... 1, 6

*Duferco Steel, Inc. v. United States*,
   296 F.3d 1087 (Fed. Cir. 2002) ................................................................................................ 1, 5

*Fedmet Res. Corp. v. United States*,
   755 F.3d 912 (Fed. Cir. 2014) ..................................................................................................... 14

*Maquilacero S.A. de C.V. v. United States*,
   256 F. Supp. 3d 1294 (CIT 2017) ............................................................................................... 14

*Mitsubishi Polyester Film, Inc. v. United States*,
   321 F. Supp. 3d 1298 (CIT 2018) ............................................................................................... 12

*NSK Ltd. v. United States,*
   19 CIT 1319 (1995) ....................................................................................................................... 8

*OTR Wheel Eng'g, Inc. v. United States*,
   853 F.Supp.2d 1281 (CIT 2012) .............................................................................................. 1, 12

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*,
   101 F.4th 1310, 1326 (Fed. Cir. 2024). ...................................................................................... 12

*Ta Chen Stainless Steel Pipe, Ltd. v. United States,*
   23 CIT 804 (1999) ......................................................................................................................... 8

*Zhejiang Amerisun Tech. Co. v. United States,*
   687 F. Supp. 3d 1282 (CIT 2024) ................................................................................................. 5

**Other Authorities**

*Certain Aluminum Extrusions from China*,
   Investigation Nos. 701-TA-475 and 731-TA-1177, Pub. 4229 (May 2011) ................... *passim*

# INTRODUCTION

Plaintiff Wagner Spray Tech., Corp. ("Wagner") submits this Reply Brief in response to Defendant's Response to Plaintiff's Motion for Judgement Upon Agency Record filed on September 17, 2024 (hereinafter, "Gov. Br."). For the reasons outlined below, the Court should reject the Government's arguments in full.

# ARGUMENT

I. **THE GOVERNMENT'S INTERPRETATION OF THE FIVE HEAT SINK EXCLUSION CRITERIA AS APPLIED TO WAGNER'S PRODUCT IS UNREASONABLE AND NOT SUPPORTED BY SUBSTANTIAL EVDIENCE**

In its brief, the Government walks through the five criteria Commerce developed to determine whether a product falls within the heat sink exclusion. Wagner does not challenge Commerce's general use of these criteria, which were upheld by this Court in *Agilent Techs. v. United States*, 335 F. Supp. 3d 1347, 1354 (Ct. Int'l Trade 2018). Rather, like in *Agilent Techs.*, Wagner challenges Commerce's interpretation of those criteria as applied to its finished heat sink manifold, part number 805-324. For each of the individual criteria, Commerce and the Government apply either an unreasonable analysis or make conclusory statements that are not supported by the record. These interpretations are contrary to the axiom that "[s]cope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel, Inc. v. United States,* 296 F.3d 1087, 1089 (Fed. Cir. 2002) ("*Duferco*"). Further, for a (k)(1) determination "to be dispositive, the permissible sources examined by Commerce 'must be controlling of the scope inquiry in the sense that they *definitely answer* the scope question.' " *OTR Wheel Eng'g, Inc. v. United States*, 853 F.Supp.2d 1281, 1287–88 (CIT 2012) (quoting *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir.

1

2007) ) (emphasis added). Commerce's interpretation regarding Wagner's product failed to satisfy these requirements.

      **A.    The Government Is Wrong that Wagner's Product is Not a "Fabricated Heat Sink Made From Aluminum Extrusions"**

In its brief, the Government argues that the Commerce was correct to conclude that Wagner's heat sink was "primarily a pump valve" and therefore was not, and could not be, a fabricated heat sink. This argument is not supported by substantial evidence and is unreasonable.

As support for this argument, the Government first outlines the physical descriptions of fabricated heat sink from the Orders and the ITC Final Report[1]:

> The *Orders* state that a "{f}abricated heat sink{} {is} generally understood to be any heat sink blank that has been cut-to-length, precision machined, and/or otherwise fabricated to the end product specifications, but not yet tested, assembled onto other materials, or packaged." *Orders*, 76 Fed. Reg. at 30,650. In addition, the ITC Final Report provides that "finished heat sinks 'are designed to remove the damaging heat from electronic equipment' and 'are different from most other aluminum extrusion … by virtue of the specific and precise tolerances to which they are generally produced." ITC Final Report at 7; Final Scope Ruling at 12. The ITC also explained that finished heat sinks are different from other aluminum extrusions:
>
> > The flat surface tolerance for {heat sinks} is often 1/1000 of an inch per inch, compared to 4/1000 to 14/1000 of an inch per inch for ordinary aluminum extrusions. The precise flatness of {heat sinks} allows for close contact between the {heat sink} and the heat-generating components for which they have been designed and to which they are attached, thereby reducing or eliminating heat- trapping dead air.
>
> ITC Final Report at 7.

Gov. Br. at 17-18. The Government then notes that the record demonstrates that Wagner's part number 805-324 is fabricated using computer numerical control (CNC) processing from an

---

[1] U.S. International Trade Commission, *Certain Aluminum Extrusions from China*, Investigation Nos. 701-TA-475 and 731-TA-1177, Pub. 4229 (May 2011).

extruded aluminum blank "with dimensions held to high tolerances and stringent quality standards" *Id*. at 18. CNC machining to tight tolerances and a flatness of 1/000 are key characteristics of a fabricated heat sink and precisely describe Wagner's part number 805-324. Wagner Br. at 18-19; Scope Ruling Request at 19-20 (providing design specifications confirming these figures) (**CR.1-2/PR 1**).

In addition to meeting these physical characteristics, it is undeniable and indisputable that a critical function of part number 805-324 is that it dissipates heat away from the electric components (i.e., acts as a heat sink). As explained:

> The manifold is bolted to the bottom side of the motor housing and is exposed to air for heat dissipation. The mass size and surface area of the manifold serves as a heat sink that draws heat from the motor and electronic components on a printed circuit board ("PCB"). The circuit board is located at the bottom of the pump assembly and operates at a high temperature. The manifold also pulls heat away from the mechanical action of the piston seals, bushings, etc. As the manifold draws heat away from the motor and PCB it then dissipates the heat at a consistent rate so as to maintain a stable temperature. The stable temperature permits the paint sprayer to function properly.

Scope Ruling Request at 21-22 (**CR.1-2/PR 1**). Thus, Wagner's product meets the physical description of a fabricated heat sink and the operational qualities of a heat sink.

Despite this, the Government nevertheless claims that because Wagner did not call the component a "heat sink" in its owner's manual and because paint also flows through the component, it cannot be a "fabricated heat sink." This is not reasonable or supported by the record. Indeed, the Government is entirely wrong to state that "evidence demonstrates that any heat-dissipating properties of part number 805-324 are incidental to its primary purpose of controlling the flow of paint." Gov. Br. at 19. If part number 805-324 did not function as a heat sink, the motor and pc board would overheat and the sprayer would not function. If part number 805-324 was not hollow, paint could not flow through it and the sprayer also would not function.

3

It is not reasonable to claim that the hollow shape is more important than the heat sink capabilities. While part number 805-324 is a dual purpose item, the design, production and testing of the product are focused almost entirely around its heat sink capabilities and requirements. As described in Wagner's opening brief at 25-29, the material, shape and tolerances of the product are focused much more on the heat dissipation and thermal requirements rather than paint flow (which only requires a hollow manifold). Thus, while it may be in dispute whether part number 805-324 satisfies the thermal, design, production and testing criteria for the purposes *of the Orders*, it cannot be disputed that the product is a fabricated heat sink. Moreover, we note that while the owner's manual may have referred to this part as one name, the schematics for part 805-324 referred to this as a "manifold":

```
TITLE:       MANIFOLD, 440i, MACH
PART NUMBER: 805-324   SHEET SIZE: D   REV
```

Wagner Supp. Response at 4 (**CR 5/PR 27**).

      The record demonstrates that Wagner's product meets all descriptions of fabricated heat sinks in the (k)(1) materials. The Government does not point to any statement or fact on the record stating that fabricated heat sinks cannot have dual functions. Indeed, the record demonstrates that fabricated heat sinks share a common characteristic with other extrusions in that:

> finished heat sinks ("FHS")} are not different from other aluminum extrusions in terms of their metallurgic chemistry, or by virtue of being further fabricated or produced in custom shapes. **FHS are different from most other aluminum extrusions, however, by virtue of the specific and precise tolerances to which they are generally produced. . .**
>
> **FHS also differ from other aluminum extrusions (including heat sinks that are not "finished") because of their customized thermal resistance properties. Whereas most aluminum extrusions are**

4

> **differentiated by shape and dimension, FHS are also characterized by their thermal resistance properties.**

ITC Final Report at 7 (emphasis added). The Government and Commerce therefore impose a silent requirement on fabricated heat sinks not present. That is, even though finished heat sinks can be limitlessly customizable in terms of fabrication and shape, the Government claims they cannot have a purpose other than that of a heat sink. This interpretation is not lawful. In *Zhejiang Amerisun Tech. Co. v. United States*, the Court cautioned that "Commerce's position that the scope language's silence permits Commerce to interpret the subject merchandise within the scope of the Orders is the opposite of the principle set forth in *Duferco*.", 687 F. Supp. 3d 1282, 1290 (CIT 2024).

In sum, it is not, as the Government claims, that Wagner is merely disagreeing with Commerce's interaction. The plain language of the ITC Final Report outlines the physical and operational characteristics of a fabricated heat sink – i.e., CNC machining, produced to specific flatness, and focused on thermal requirements. Wagner's product satisfies each of those requirements, which is supported by substantial evidence. What Wagner calls its product in its owner's manual and whether the item also has other functions, does not change these clear facts.

**B.     Wagner's Heat Sinks Have Specified Thermal Performance Requirements**

In its brief, the Government agreed that Commerce was reasonable in finding that Wagner's product did not have "specified thermal performance requirements." Gov. Br. at 20. Specifically, the Government argues that (1) having thermal requirements that the heat sink manifold must satisfy for the sprayer and the PC Board and Motor it is attached to to dissipate heat from is not a "specified thermal performance requirement" and (2) that to satisfy for the exclusion the heat sinks must have a "certification", which Wagner's product do not. As discussed in Wagner's brief, Commerce has gone well beyond the plain language of the ITC

5

Final Report and is imposing unstated and undefined requirements that product must meet to satisfy this exclusion. This is unreasonable and unlawful

This Court found in *Agilent Techs*. that: "The exclusionary provision of the Orders does not unambiguously define "the design and production of which are organized around meeting certain specified thermal performance requirements." *Agilent Techs*., 335 F. Supp. 3d at 1354. Here, as in that case:

> Both parties discuss at length the meaning of the exclusion term "specified thermal performance requirements." The Parties differ in their understanding of how the thermal performance requirements may be met, and it is unclear how the industry views "specified thermal performance requirements."

*Id*.

The ITC Final Report states that finished heat sinks are "*characterized* by their thermal resistance properties." ITC Final Report at 7. Wagner's part number 805-324 is indisputably characterized by thermal resistance proprieties. Wagner's manifold must be able to cool the motor, PC board and sprayer to the temperature requirements in UL 746C and UL 1450. The specific thermal requirements that the manifold must meet are:

1) Prevent the sprayer from being over 125 degree Celsius;

2) For the PC board, the bridge rectifier can have a temperature rise of 65 degrees Celsius and a maximum of 86.41 C and the triac 25 A 600V a temperature of 65 degrees Celsius and a maximum of 86.25 C; and

3) For the motor, a temperature rise of 140 degrees Celius and a maximum of 162.51 C.

Wagner Supp Response at 1-2 (**CR 5/PR 27**).

The ITC Final Report does not explain, describe, or detail what type of thermal performance standards are required for finished heat sinks; nor does it give any examples.

6

Commerce similarly does not identify the type of thermal performance standards needed to meet the exclusion. The ITC Final Report further does not discuss or identify a single equation or measurement that are required to assess thermal resistance or conductivity, or the different types of thresholds needed for a FHS. This point cannot be understood. The Government and Commerce state emphatically that the thermal performance requirements cannot be measured by the temperature parameters of the components the heat sink is meant to control. But they never state what a thermal performance requirement of an individual FHS is, or how its measured. The Government only states that "Commerce reasonably determined that 'the thermal performance of part number 805-324 being 'tied to' the operating temperature standards for the downstream product is not sufficient to meet the specific requirements of the finished heat sink scope exclusion, which requires that specified thermal performance requirements must exist for the inquiry merchandise." Gov. Br. at 22. This undefined but "we know it when we see it" requirement cannot be the basis of Commerce's decision.

      The ITC Final Report states that finished heat sinks have "*customized* thermal resistance properties" relative to "to the customers for whom FHS have been designed." ITC Final Report at 7 (emphasis added). This demonstrates that the thermal performance requirements are dictated by the end product for which the heat sink is intended. Thus, the thermal performance needs of the electrical components are necessarily the thermal performance requirements of the heat sink and are the precise reason why the ITC Final Report does not identify the specific thermal requirements needed to meet this definition. It is therefore unreasonable Commerce to conclude here that the thermal performance standards of the motor, PC board and sprayer, for which part number 805-324 is solely responsible for cooling, are not *the* thermal performance requirements for part number 805-324.

Commerce's position on the certification requirement is similarly unreasonable. The Government again makes the unwavering statement in its brief that the ITC Final Report stated that "heat sinks must be 'certified to perform within thermal resistance parameters'" and that "The ITC Final Report makes clear that, for inquiry merchandise, certification is explicitly necessary." Gov. Br. at 22-23. The ITC Final Report is not clear on the form this certification takes or the manner in which the product is certified. In other parts of the report, it appears that this may just be an assurance from the supplier that the product meets certain parameters. ITC Final Report at 33.

It is also unclear how this certification "requirement" has now become an explicit requirement when it is neither identified in the five criteria Commerce uses to evaluate this exclusion nor did Commerce ever ask Wagner about certifications during the course of the scope proceeding. Commerce issued a supplemental questionnaire to Wagner on August 15, 2023, to which Wagner responded on September 11, 2023. **CR 5/PR 27.** This questionnaire addressed a number of issues Commerce had regarding Wagner's Scope Request but not a single question asked if the specified thermal requirements were "certified." Commerce asked about all other information it believed relevant to this analysis but did not ask about certification. It is Commerce, not the respondent, which bears the burden of asking questions[,]" and Commerce must ask "clear" questions "to let the respondent know what information it really wants"); *Ta Chen Stainless Steel Pipe, Ltd. v. United States,* 23 CIT 804, 820 (1999); *see NSK Ltd. v. United States,* 19 CIT 1319, 1328, (1995) ("[r]espondents should not be required to guess the parameters of Commerce's interpretation of a phrase in the statute").

8

### C. The Government's Arguments About Design, Production and Testing Similarly Fails

In addressing the third, fourth and fifth criteria, the Government's argument is essentially the same – the design, production and testing focused on the thermal properties the heat sink will achieve when attached to the various electrical components is not sufficient for the exclusion. At bottom, the Government claims that the product must have thermal properties untethered to the electrical components for which it was custom designed/produced for and that the product must be tested in a manner separate from those electrical components. Neither the ITC Final Report, nor common sense support this interpretation.

Wagner addressed these criteria squarely in its supplemental response. Wagner explained:

> 2. On pages 19-22 of your Scope Request and pages 6-10 of your Rebuttal Comments, you state that several design aspects of the heat sink manifold achieve the requirements of UL 1450. Please provide an explanation and documentation of how the design of the heat sink manifold was organized around meeting the specified thermal performance requirements, including the specified thermal resistance parameters, that you provide in response to question 1, above.
>
> **Response**: In the development stage, the electronic PC board components and electric motor are tested in the Wagner Spray Tech ETL approved laboratory. The engineering department tests the standalone component prototypes on a test bench for measuring maximum operating temperatures that are then compared to the maximum thermal UL test standards for those components. The prototype test results are used for the design of the finished heat sink manifold to achieve the UL thermal requirements. That is, the difference in the operating temperature and the UL thermal requirements is the amount of heat that the heat sink manifold must diffuse or "pull away" from the electrical components. Thus, pre-production protype testing results for the individual components are used for defining the finished heat sink thermal resistance parameters.
>
> The below photos show the motor and PC Board and the actual tests for individual components that are completed on a test bench with controlled variables using calibrated test equipment such as thermocouples and electrical diagnostic apparatuses and equipment.

The UL 1450 temperature requirements are continually reviewed and early prototype testing takes place to verify that the temperature requirements are achieved. Changes are then made to the heat sink manifold based on actual test results and then the product is tested again until the temperature of the motor, housing touch points and electrical components are within the acceptable limits to meet UL 1450 requirements.

Finished heat sink design

The finished heat sink manifold is designed to function as an integral component to control thermal conductivity for the individual electronic PC Board components and the electrical motor. Size, mass, and surface area are key attributes for heat absorption and dissipation.
The finished heat sink manifold material and production process is based on strength, heat absorption, ability to hold tight tolerance, and superior surface finish. The manufacturing method chosen is CNC machined from large, extruded aluminum blanks.

Shape

The finished heat sink manifold has a large mass of 1.5 pounds to absorb the thermal heat generated from the paint sprayer's pump and printed circuit board. For efficient thermal dissipation, the exterior surface of the manifold/heat sink is 66 square inches.

3

Surface finish

The precise flatness of Wagner's manifold is critical to the product's ability to dissipate the necessary heat away from the PC board and motor and achieve the UL 746C thermal parameters necessary for those components. The manifold is bolted directly to the bottom of the motor housing (which contains the motor and PC board), with the surface of the manifold directly on the surface of the motor housing; there is no gasket in between and the surfaces are flush with one another. The more contact there is between the manifold and the housing, the more heat that can be drawn away from the motor housing. Thus, the heat sink needs to be designed for a certain flatness. As the ITC recognized, the flat surface tolerance is a key physical characteristic of a finished heat sink as compared to a typical in-scope unfinished heat sink, or other in-scope aluminum extrusions. The ITC explained:

> The flat surface tolerance for FHS is often 1/1000 of an inch per inch, compared to 4/1000 to 14/1000 of an inch per inch for ordinary aluminum extrusions. The precise flatness of FHS allows for close contact between the FHS and the heat-generating components for which they have been designed and to which they are attached, thereby reducing or eliminating heat-trapping "dead air."

ITC Report at 7. This is the same flatness that Wagner designed in its heat sink manifold:

> The heat sink manifold's mounting surface specification is defined with geometric tolerancing (GD&T) for flatness of 3/1000 (.003") for the total manifold machined surface. The machined surface area is 2.20" x 4.50". Using the shortest distance .003" flatness / 2.20" surface width = .001" which equates to 1/1000 inch per inch for the flat surface finish. This flat surface is the surface that is attached to the paint sprayer motor and is part of the key heat sink functionality. In addition to the flatness specification, the surface finished is specified to a maximum micron finish of 125 Ra.

Wagner Scope Request at 3.

> In **Exhibit 3** we provide the 805-324 specification, finalized in 2007. This is the last time that the heat sink manifold was re-designed. This identifies the specific flatness and surface finish needed:
>
> Material selection
>
> As acknowledged by metallurgy standards, extruded aluminum has high thermal conductivity properties for producing heat sink components. Aluminum 6061 is the most common material used industry wide for heat sinks. There are alternative materials that have a higher thermal conductivity starting with the highest level of silver, copper, gold and then aluminum. For cost effectiveness, corrosion, and the ability to machine into highly dimensional precision components, aluminum is the optimum material to use for this application.
>
> In sum, when designing the heat sink manifold, Wagner first determined the temperature parameters needed by testing individual electrical components and comparing those results to the relevant UL standards. Based on those results, Wagner identified the shape, material, size and flat surface tolerance needed to achieve those temperature parameters.

Wagner Supp Response at 2-6 (**CR 5/PR 27**). Regarding testing, Wagner explained:

11

> Response: As noted, contained within the UL 1450 standard are the temperature standards for the individual electrical components under UL746C. The heat sink manifold is tested to achieve these temperatures. During testing, thermocouples are attached to the relevant PC board components and to the motor to determine whether the heat sink manifold is functioning at the thermal level needed.
>
> This testing takes place in three stages. Testing first occurs during the development phase of the heat sink manifold and other parts. Next, testing occurs during a short production run of the newly designed product. Last, once regular production starts, random testing occurs to ensure that heat sink manifold is operating as needed and maintaining the proper temperature levels of the PC board, motor and sprayer overall.

*Id*. at 7.

Taken together, this information conclusively demonstrates that the Wagner's heat sink was designed and produced to achieve specific thermal requirements in the paint sprayer and electrical components to which it is attached and then tested at various phases to ensure it is achieving those thermal requirements. The Government does not disagree but states that this is insufficient to meet the exclusion. It argues that Commerce has the discretion to interpret the ITC Final Report and to determine whether it "answer{s} the scope question.". Gov Br. at 27, citing *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 101 F.4th 1310, 1326 (Fed. Cir. 2024). This statement is somewhat misleading. Yes, Commerce has the discretion to determine whether (k)(1) sources answer the scope question but if it determines that a (k)(1) source is dispositive, it "'must be controlling of the scope inquiry in the sense that they *definitely answer* the scope question.'" *OTR Wheel Eng'g, Inc.*, 853 F.Supp.2d at 1287–88. Commerce does not have the discretion to interpret the (k)(1) sources however it wants. That interpretation must be reasonable and supported by substantial evidence. *See Mitsubishi Polyester Film, Inc. v. United States*, 321 F. Supp. 3d 1298, 1308–09 (CIT 2018) (explaining that to sustain Commerce's scope determination, "the court must conclude that substantial evidence on the record supports Commerce's determination that the (k)(1) factors definitively resolve the ambiguity in the scope language.").

12

The Government does not identify where in the ITC Final Report it limits the design, production and testing to the product itself rather than in conjunction with the final goods. The only instance it does so is when it argues as follows:

> Wagner's premise—that a unique part can only be tested along with the electrical components—is contradicted by *Aligent* and the underlying scope ruling. *See* Agilent Final Scope Ruling at 6. The product at issue in *Agilent* (a solid aluminum extrusion called a mass filter radiator) was uniquely designed and built to Agilent specifications and could not be used for any other purpose other than in downstream Agilent products (mass spectroscopy instruments). *See* Agilent Final Scope Ruling at 6 ("Aligent explained … that it designs and manufactures gas chromatography mass sprectoscopy (mass spectrometer) instruments, which incorporate the {mass filter radiator}, a finished aluminum component which is manufactured from extruded aluminum."). Despite this, Agilent specifically tested the product at issue. *Id.*;*Agilent I*, 256 F. Supp. 3d at 1345 (describing Agilent's declaration that provided details regarding the mass filter radiator's heat transfer properties, including the certain material specifications, required temperature changes, and thermal resistance parameters).

Gov. Br. at 29-30. Neither the Agilent Final Scope Ruling nor the description of the declaration in *Agilent I* indicate that the product at issue was individually tested without being attached to electrical components. While it is possible that the details of the declaration in that case contained that information, that is neither clear in the scope decision nor in the Court's decision. It is also surprising that the only support for the Government's position is the *Agilent* case, which does not contain a Commerce decision that Agilent's product is out of scope. Rather, that case involved a settlement and dismissal of the appeal of the original scope determination. The Government, however, cannot cite to any persuasive statements or evidence in the (k)(1) materials stating that finished heat sinks cannot be tested when connected to electrical components. It is unreasonable to conclude that custom heat sinks cannot meet the exclusionary

13

definition solely because they are designed, produced and tested with the electrical components they are meant to cool in mind.

Ultimately, while the court "afford[s] significant deference to Commerce's own interpretation of its orders," *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014), Commerce cannot "impose[ ] a requirement not contained in the Order," *Maquilacero S.A. de C.V. v. United States*, 256 F. Supp. 3d 1294, 1310 (CIT 2017). Yet, throughout Commerce's decision, that is precisely what it has done. It has imposed unstated and undefined requirements needed to meet this exclusion that are not contained in either the Orders or (k)(1) materials. And for this reason, the decision must be remanded.

## CONCLUSION

Wagner requests that this Court hold that Commerce's Final Scope Ruling is unsupported by substantial evidence and otherwise not in accordance with law and remand the final results with instructions to issue a new determination that is consistent with the Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/ Andrew T. Schutz*
Andrew T. Schutz
Jordan C. Kahn

1201 New York., Ave., NW
Suite 650
Washington, DC 20005
(202) 783-6881

Dated: November 13, 2024

## **CERTIFICATE OF COMPLIANCE**

  Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 3,344 words, less than the 7,000 word limit.

               */s/ Andrew T. Schutz*
               Andrew T. Schutz

               *Counsel for Plaintiffs*

Dated: November 13, 2024