**Slip Op. 25-49**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **WAGNER SPRAY TECH CORPORATION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,**<br><br>**Defendant-Intervenor.** | **Before: Jennifer Choe-Groves, Judge**<br><br>**Court No. 23-00241** |

**OPINION AND ORDER**

[Remanding the U.S. Department of Commerce's final scope ruling on Wagner Spray Tech Corporation's finished heat sink manifold/paint sprayer product.]

Dated: April 21, 2025

Andrew Thomas Schutz, Jordan C. Kahn, Michael Scott Holton, and Ned Herman Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of Washington, D.C., for Plaintiff Wagner Spray Tech Corporation.

Reginald T. Blades, Jr., Assistant Director, and Collin T. Mathias, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director. Of counsel on the brief was Jared Michael Cynamon,

Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C. Also of counsel was Danielle V. Cossey, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Alan Hayden Price, Robert Edward DeFrancesco, III, Elizabeth Seungyon Lee, Laura El-Sabaawi, and Paul A. Devamithran, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor Aluminum Extrusions Fair Trade Committee.

Choe-Groves, Judge: Plaintiff Wagner Spray Tech Corporation ("Wagner" or "Plaintiff") is an importer of paint sprayers who filed this action challenging the final scope ruling on part number 805-324 of Wagner's Titan 440 line of paint sprayers ("Wagner's product," or "part 805-324") issued by the U.S. Department of Commerce ("Commerce"). Summons, ECF No. 1; Compl. ¶¶ 1, 3, 8, ECF No. 10. Commerce determined that Wagner's paint sprayer was covered by the scope of the antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China ("China") (collectively, "Orders") and not eligible for the scope exclusion for finished heat sinks under the Orders. See Final Scope Ruling on Wagner Finished Heat Sink Manifold, A-570-967 and C-570-968 (Oct. 17, 2023) (P.R. 30)[1] ("Final Scope Ruling"); see also Aluminum Extrusions from the People's Republic of China, 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011) (antidumping duty order) ("Antidumping Duty Order"); Aluminum Extrusions from the People's Republic of China, 76 Fed. Reg. 30,653 (Dep't of

[1] Citations to the administrative record reflect the public record ("P.R."), ECF No. 32.

Commerce May 26, 2011) (countervailing duty order) ("Countervailing Duty Order").

Before the Court is Plaintiff's Rule 56.2 motion for judgment on the agency record, in which Plaintiff argues that Commerce erred in finding that Wagner's paint sprayer did not fall within the finished heat sink exclusion of the Orders on aluminum extrusions from China. Pl.'s Mot. J. Agency R. & Pl.'s Mem. L. Supp. Pl.'s Mot. J. Agency R. ("Pl.'s Mot."), ECF No. 23. The United States ("Defendant" or "Government") and Defendant-Intervenor Aluminum Extrusions Fair Trade Committee ("Defendant-Intervenor" or "AEFTC") oppose Plaintiff's motion. Def.'s Resp. Pl.'s Mot. J. Agency R. ("Def.'s Resp."), ECF No. 24; Def.-Interv. Aluminum Extrusions Fair Trade Committee Resp. Mot. J. Agency R. ("Def.-Interv.'s Resp."), ECF No. 25. Plaintiff filed a reply brief. Pl.'s Reply Br., ECF No. 28. In lieu of oral argument, the Court issued questions to the Parties, and the Parties submitted written responses. Letter (Jan. 8, 2025), ECF No. 35; Paperless Order (Feb. 6, 2025), ECF No. 36. For the reasons set forth below, the Court remands Commerce's final scope ruling.

## BACKGROUND

Commerce issued the two Orders on aluminum extrusions from China on May 26, 2011. Antidumping Duty Order, 76 Fed. Reg. at 30,650; Countervailing

Duty Order, 76 Fed. Reg. at 30,653. Both Orders had identical scope language, which provided the following description of the subject merchandise:

> The merchandise covered by this order is aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents).

Antidumping Duty Order, 76 Fed. Reg. at 30,650; Countervailing Duty Order, 76 Fed. Reg. at 30,653.

The Orders explicitly excluded "finished heat sinks." Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654. Finished heat sinks are defined as follows:

> Finished heat sinks are fabricated heat sinks made from aluminum extrusions the design and production of which are organized around meeting certain specified thermal performance requirements and which have been fully, albeit not necessarily individually, tested to comply with such requirements.

Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654.

The exclusion of finished heat sinks from these Orders resulted from the U.S. International Trade Commission's ("ITC") determination[2] that finished heat

[2] The ITC's like product determination regarding finished heat sinks was upheld in Aluminum Extrusions Fair Trade Comm. v. United States, 36 CIT 1370, 1372 (2012).

sinks were a separate like product from other aluminum extrusions that were causing, or presenting a threat of, material injury to the domestic industry. Certain Aluminum Extrusions from China, USITC Pub. 4229, Inv. Nos. 701-TA-475 and 731-TA-1177, at 1 (May 2011) ("ITC Final Report"). The ITC Final Report promulgated the definition for finished heat sinks set forth in the Orders and further explained that finished heat sinks are distinct from most other aluminum extrusions:

> by virtue of the specific and precise tolerances to which they are generally produced. [Finished heat sinks] are designed to remove damaging heat from electronic equipment. The flat surface tolerance for FHS is often 1/1000 of an inch per inch, compared to 4/1000 to 14/1000 of an inch per inch for ordinary aluminum extrusions.

Id. at 7. In terms of production, the ITC Final Report identified that "[s]pecialized equipment, including wind tunnels, flow calibration equipment, testing equipment, and specialized design and data collection software, are used to design [finished heat sinks] and to produce prototypes." Id. at 8. The ITC Final Report also highlighted the "customized thermal resistance properties" of finished heat sinks as a distinguishing characteristic of the merchandise. Id. at 7. Additionally, the ITC Final Report noted that finished heat sinks "are certified to perform within thermal resistance parameters" and are "precisely or optimally suited to cool the specific electronic devices for which they have been designed." Id.

On November 21, 2022, Plaintiff filed a scope ruling request seeking a determination that its "finished heat sink manifold [wa]s not within the scope of the Aluminum Extrusions Order because it f[ell] within the express exclusion for 'finished heat sinks.'" Wagner Spray Tech Corporation Scope Ruling Application: Finished Heat Sink Manifold, Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China, A-570-967/C-570-968 ("Scope Ruling Request") at 9 (P.R. 1). In the Scope Ruling Request, Plaintiff explained that its product is made from extruded aluminum and "meet[s] specifications for 6061-T6 aluminum alloy." Id. at 3. Wagner's finished heat sink manifold was designed "with geometric tolerancing (GD&T) for flatness of 3/1000 (.003") for the total manifold machined surface." Id. When measuring the shortest distance of .003" flatness and dividing that by 2.20" of surface width, a 1/1000 inch per inch flat surface finish results. Plaintiff averred that "[t]his flat surface [wa]s the surface that [wa]s attached to the paint sprayer motor and [wa]s part of the key heat sink functionality." Id.

Wagner's finished heat sink manifold "[wa]s custom designed for use exclusively in Wagner's Titan 440 line of paint sprayers." Id. at 4. Within the paint sprayer, the finished heat sink manifold served two purposes: "controlling the flow of liquid paint and heat dissipation to maintain acceptable temperature of the pump and motor." Id. at 4–5.

In its Scope Ruling Request, Wagner asserted that its heat sink manifold met

the criteria for exclusion from the Orders: "(1) the design and production of the

product must be organized around meeting specified thermal performance

requirements" and "(2) the product must be fully, but not necessarily individually,

tested to meet those specified thermal performance requirements." Id. at 17, 22.

First, Wagner explained that its product was "designed to satisfy the UL

(Underwriters Laboratories) 1450 temperature test requirements." Id. at 17.  Then,

Wagner detailed how "[s]everal design and production aspects of the finished heat

sink manifold achieve[d] these thermal requirements." Id. at 19–22.

Wagner explained that thermal testing occurred on an assembled paint

sprayer to "determine[] if the manifold dissipates sufficient heat to prevent

overheating and fire risk." Id. at 22.  This testing was conducted by a qualified

electronic testing laboratory.  Id.  Wagner asserted that its finished heat sink

manifold met the exclusion criteria because it was: (1) designed and produced

according to specified thermal requirements set forth in the UL test requirements;

and (2) tested to meet those requirements once incorporated into the paint sprayer.

Id. at 16–23.

After receiving Wagner's Scope Ruling Request, Commerce initiated a

scope inquiry into Wagner's finished heat seat manifold.  Initiation of Wagner

Spray Tech Corporation (Wagner) Heat Sink Manifold Scope Inquiry (Dep't of

Commerce Dec. 22, 2022) (P.R. 2).  Defendant-Intervenor filed comments in

opposition to Wagner's Scope Ruling Request.  Aluminum Extrusions from the

People's Republic of China: Comments on Wagner's Scope Ruling Request

("Def.-Interv.'s Comments Wagner's Scope Ruling Request") (P.R. 14).

Defendant-Intervenor argued that Wagner's product was within the scope of the

Orders and that Wagner's product was not a finished heat sink at all.  Id. at 3–6.

Defendant-Intervenor argued that Wagner's product was simply a "pump block[]"

made from extruded aluminum and "not every aluminum product [wa]s a heat

sink." Id. at 5.  Lastly, Defendant-Intervenor averred that even if Wagner's

product was a heat sink, it did not meet the exclusion criteria.  Id. at 6–13.  Wagner

submitted rebuttal comments in response to Defendant-Intervenor's comments.

Wagner Rebuttal Comments: Finished Heat Sink Manifold, Antidumping and

Countervailing Duty Orders on Aluminum Extrusions from the People's Republic

of China, A-570-967/C-570-968 ("Wagner Rebuttal Comments Scope Ruling

Request") (P.R. 17).

        After receiving these comments, Commerce sent Wagner a supplemental

questionnaire.  Aluminum Extrusions from the People's Republic of China:

Supplemental Questionnaire ("Suppl. Quest.") (P.R. 22).  In the supplemental

questionnaire, Commerce noted that "it appear[ed] that UL 1450 relate[d] to

temperature and other requirements for the finished downstream product (i.e., the

paint sprayer), rather than the thermal performance requirements of the product at issue in this scope inquiry (i.e., the heat sink manifold)." Id. at 4. Commerce requested documentation from Wagner of specified thermal performance requirements "of the heat sink manifold itself." Id. Commerce also requested explanations and documentation of how Wagner's product was designed, produced, and tested according to the specific thermal requirements of its heat sink manifold. Id.

Wagner responded to Commerce's supplemental questionnaire and affirmed that the "thermal performance requirements of the heat sink manifold [were] tied to the performance components that the heat sink manifold [wa]s designed for." Wagner Supplemental Questionnaire Response: Finished Heat Sink Manifold, Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China, A-570-967/C-570-968 ("Wagner's Suppl. Quest. Resp.") at 1 (P.R. 27). Wagner expanded on the thermal requirements and explained that there were three main components that its finished heat sink manifold must dissipate heat from: the PC board, the motor, and the paint sprayer as a whole. Id. Each component had its own thermal requirements. Id. Wagner averred that the ITC Final Report contextualized the thermal performance requirements of finished heat sinks as "intended to meet the specific needs of a given piece of electronic equipment." Id. at 2. Wagner then explained how its

finished heat sink manifold was designed, produced, and tested according to the thermal requirements of the PC board, motor, and paint sprayer.  Id. at 2–7.

Defendant-Intervenor submitted comments responding to the information in Wagner's supplemental response.  Aluminum Extrusions from the People's Republic of China: Comments on Wagner's Supplemental Questionnaire Response ("Def.-Interv.'s Comments Wagner Suppl. Quest. Resp.") (P.R. 28).  Defendant-Intervenor reiterated that Wagner's product was within the scope of the Orders and was not a heat sink eligible for exclusion.  Id.  Wagner submitted rebuttal comments.  Wagner Rebuttal Comments: Wagner Heat Sink Manifold, Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China, A-570-967/C-570-968 ("Wagner Rebuttal Comments Suppl. Quest.") (P.R. 29).

Commerce issued its Final Scope Ruling on October 17, 2023, determining that Wagner's product did not qualify for the finished heat sink exclusion and fell within the scope of the Orders.  Final Scope Ruling at 10.  In its Final Scope Ruling, Commerce identified the five characteristics that it used to determine whether Wagner's product should be classified as a finished heat sink:

> (1) the product must be a "fabricated heat sink made from aluminum extrusions;" (2) specified thermal performance requirements must exist; (3) the product's design must have been organized around meeting those specified thermal performance requirements; (4) the product's production must be organized around meeting the specified thermal performance requirements; and (5) the product must have been

> fully, albeit not necessarily individually, tested to comply with the specified thermal performance requirements.

Id. at 11 (citing Agilent Techs. v. United States ("Agilent II"), 42 CIT __, __, 335 F. Supp. 3d 1347, 1352–53 (2018)). In coming to this determination, Commerce relied upon the scope language in the Orders, this Court's prior opinion in Agilent II, Wagner's description of its product in each of its submissions, prior rulings from Commerce, and the ITC Final Report.

First, despite confirming that Wagner's part 805-324 served the same function and had the same features as a fabricated heat sink as defined by the ITC, including a flat surface tolerance of 1/1000 of an inch per inch, Commerce determined that Wagner's product was not a fabricated heat sink.[3] Final Scope Ruling at 12. Commerce emphasized that part 805-324 served dual purposes: pumping paint and dissipating heat. Id. Next, Commerce highlighted that the owner's manual for the paint sprayer identified part 805-324 as a "pump valve" or "pump block." Id. Because Wagner's product served dual purposes and Wagner's manual did not refer to the product as a heat sink manifold, Commerce determined that the product's primary purpose was "not that of a heat sink." Id. Commerce

[3] The scope exclusion for finished heat sinks specifies that the product at issue must be a "fabricated heat sink made from aluminum extrusions." Thus, the inquiry under the first factor will focus on "fabricated heat sinks" rather than "finished heat sinks."

determined that Wagner's product was not a fabricated heat sink made from aluminum extrusions. Id.

Next, Commerce determined that Wagner failed to demonstrate that specified thermal performance requirements existed for the finished heat sink manifold. Id. at 13. Commerce acknowledged that Wagner "demonstrated that standards for safe operating temperatures exist[ed] for the downstream product (i.e., the paint sprayer) and for other components of the downstream product (i.e., the PC board and motor." Id. Commerce noted that the ITC Report described finished heat sinks as "precisely or optimally suited to cool the specific electronic devices for which they [were] designed," id. (quoting ITC Final Report at 7), but stated that Wagner was required to show that specified thermal performance requirements existed for the heat sink itself, separate from that of any downstream product or component. Id.

Commerce then determined that Wagner failed to meet the third, fourth, and fifth factors, in large part because Wagner had failed to show that it satisfied specified thermal performance requirements for which the product was designed, produced, and tested. Id. at 13–15. In its analysis of the product's design, Commerce explained that because Wagner did "not demonstrate[] that specified thermal performance requirements exist[ed], as explained above, we f[ound] that it also has not demonstrated that part number 805-324's design was organized around

meeting those specified thermal performance requirements." Id. at 14.  Similarly,

when it analyzed the product's production, Commerce stated that "because Wagner

has not demonstrated that specified thermal performance requirements exist, as

explained above, we f[ound] that it also has not demonstrated that part number

805-324's production was organized around meeting those specified thermal

performance requirements." Id.  Lastly, when analyzing the product's testing,

Commerce explained that "because Wagner has not demonstrated that specified

thermal performance requirements exist, as explained above, we find that it also

has not demonstrated that part number 805-324 has been fully tested to comply

with those specified thermal performance requirements." Id. at 15.

Wagner commenced this action on November 17, 2023.  Summons.  Wagner

filed its Rule 56.2 motion on May 29, 2024, asserting that Commerce's Final

Scope Ruling was not supported by substantial evidence on the record and was

otherwise not in accordance with law.  Pl.'s Mot. at 1.  The Government argues

that Commerce's determination was supported by substantial evidence, was in

accordance with the law, and should be sustained.  Def.'s Resp. at 2.  AEFTC joins

in the Government's argument.  Def.-Interv.'s Resp. at 3.

In lieu of oral argument, the Court issued questions to the Parties.  Letter

(Jan. 8, 2025); Paperless Order (Feb. 6, 2025).  The Parties submitted responses to

the Court's questions. Pl.'s Resp. Court's Letter (Feb. 14, 2025); Def.'s Resp. Court's Letter (Feb. 14, 2025).

## ISSUE PRESENTED

Whether Commerce's determination that Wagner's product did not satisfy the finished heat sink exclusion and was within the scope of the Orders was supported by substantial evidence and in accordance with law.

## JURISDICTION AND LEGAL STANDARDS

### I. Jurisdiction and Standard of Review

The U.S. Court of International Trade has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final determination of an administrative authority as to whether a particular type of merchandise falls within the scope of an antidumping duty order or a countervailing duty order. The Court will hold unlawful "any determination, finding, or conclusion [that] is unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." A.L. Patterson, Inc. v. United States, 585 Fed. App'x 778, 781–82 (Fed. Cir. 2014).

## II.      Legal Framework for Scope Determination

The descriptions of merchandise covered by the scope of an antidumping or countervailing duty order must be written in general terms, and questions may arise as to whether a particular product is included within the scope of an order.  See 19 C.F.R. § 351.225(a).  When such questions arise, Commerce's regulations direct it to issue scope rulings that clarify whether the product is in-scope.  Id.  Although there are no specific statutory provisions that govern Commerce's interpretation of the scope of an order, Commerce is guided by case law and agency regulations. See Meridian Prods., LLC v. United States ("Meridian Prods."), 851 F.3d 1375 (Fed. Cir. 2017); 19 C.F.R. § 351.225.

Commerce's inquiry must begin with the relevant scope language.  See, e.g., OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed. Cir. 2020).  If the scope language is unambiguous, "the plain meaning of the language governs."  Id.  If the language is ambiguous, however, Commerce interprets the scope with the aid of the sources set forth in 19 C.F.R. § 351.225(k)(1).  Meridian Prods., 851 F.3d at 1382.

Commerce may consider the following interpretive sources under 19 C.F.R. § 351.225(k)(1) to determine whether merchandise is covered by the scope of an order:

(A)   The descriptions of the merchandise contained in the petition pertaining to the order at issue;

> (B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;
>
> (C) Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and
>
> (D) Determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

19 C.F.R. § 351.255(k)(1)(i).

Secondary interpretive sources under (k)(1) include any other determinations of the Secretary or the Commission not identified in subsection (k)(1)(i), rulings or determinations by Customs, industry usage, dictionaries, and any other relevant record evidence. 19 C.F.R. § 351.255(k)(1)(ii). If there is a conflict between these secondary interpretive sources and the primary interpretive sources of this section, the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue. Id.

If the (k)(1) sources do not dispositively answer the question, Commerce may consider the (k)(2) factors under 19 C.F.R. § 351.225(k)(2). Meridian Prods., 851 F.3d at 1382. The (k)(2) factors include the (1) "physical characteristics (including chemical, dimensional, and technical characteristics) of the product"; (2) "expectations of the ultimate users"; (3) "ultimate use of the product"; (4)

"channels of trade in which the product is sold"; and (5) "manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2).

It is well-established that "Commerce cannot 'interpret' an antidumping order so as to change the scope of th[e] order, nor can Commerce 'interpret' an order in a manner contrary to its terms." Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citing Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998)). When a party challenges a scope determination, the Court must determine whether the scope of the order "contain[s] language that specifically includes the subject merchandise or may be reasonably interpreted to include it." Duferco Steel, Inc. v. United States ("Duferco"), 296 F.3d 1087, 1089 (Fed. Cir. 2002).

## DISCUSSION

In its Final Scope Ruling, Commerce reviewed the scope language, Wagner's description of its product in its submissions to Commerce, and two prior scope determination proceedings, ECCO Heat Sinks for LED Light Bars and Agilent Technologies' Mass Filter Radiator. Final Scope Ruling at 10–15. Commerce limited its review to (k)(1) sources and "f[ound] it unnecessary to consider the additional factors specified in 19 CFR 351.225(k)(2)." Id. at 10. After examining the (k)(1) sources, Commerce determined "that Wagner's part

number 805-324 d[id] not meet the criteria for the 'finished heat sink' exclusion"
and that "part number 805-324 [wa]s within the scope of the Orders." Id.

Plaintiff alleges that Commerce's Final Scope Ruling was unsupported by
substantial evidence and "otherwise unreasonable." Pl.'s Mot. at 17–29. Plaintiff
asserts that its product, part number 805-324, is a finished heat sink and meets the
standard for exclusion from the Orders. Id. at 17. In particular, Plaintiff argues
that Commerce improperly interpreted "the testing, design and production
requirements of the scope exclusion." Id. Defendant counters that Commerce's
Final Scope Ruling should be sustained because Plaintiff failed to show that it
satisfied any of the criteria necessary to be eligible for exclusion from the Orders.
Def.'s Resp. at 16–30.

The Orders allow for the exclusion of "fabricated heat sinks made from
aluminum extrusions the design and production of which are organized around
meeting certain specified thermal performance requirements and which have been
fully, albeit not necessarily individually, tested to comply with such requirements."
Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76
Fed. Reg. at 30,654. Although Commerce did not describe the scope exclusion
language as ambiguous in its Final Scope Ruling, given Commerce's analysis and
reliance on (k)(1) sources, the Court presumes that Commerce viewed the
exclusion language as ambiguous.

The Court concludes that the scope exclusion language is ambiguous.  For

example, the exclusion language does not define specific criteria of a fabricated

heat sink, does not identify any set of specified thermal performance requirements,

and does not establish any design, production, or testing procedures.  The scope

exclusion language only states that specified thermal performance requirements

must exist, but the exclusion does not detail any threshold requirements or

mandatory measurements.  The scope exclusion language requires that the subject

merchandise must be designed, produced, and tested to meet such thermal

performance requirements, but the exclusion does not explain how the design,

production, or testing should be executed.  Therefore, because the scope exclusion

language is ambiguous, Commerce may interpret the scope exclusion language

found in the Orders with the aid of the sources set forth in 19 C.F.R. §

351.225(k)(1) or (k)(2).  Meridian Prods., 851 F.3d at 1382.

The Parties agree that a five-factor test exists for a product to qualify for the

finished heat sink exclusion, based on Commerce's prior scope rulings in the

Agilent proceedings before this Court.  Pl.'s Mot at 17–18; Def.'s Resp. at 16–17;

see Final Scope Ruling at 11; see Results of Redetermination Pursuant to Court

Remand Aluminum Extrusions from the People's Republic of China, A-570-967

("Agilent Remand Results") at 11 (Dep't of Commerce Dec. 15, 2017).

Commerce's Final Scope Ruling proclaimed to set forth the five requirements

needed "to be considered a finished heat sink" and explained that "[a]ll five of

these elements must be present for a product to be a finished heat sink."  Final

Scope Ruling at 11 (stating that (1) the product must be a "fabricated heat sink

made from aluminum extrusions;" (2) specified thermal performance requirements

must exist; (3) the product's design must have been organized around meeting

those specified thermal performance requirements; (4) the product's production

must be organized around meeting the specified thermal performance

requirements; and (5) the product must have been fully, albeit not necessarily

individually, tested to comply with the specified thermal performance requirements

(citing Agilent II, 42 CIT at __, 335 F. Supp. 3d at 1352–53)).

The Court agrees in principle with the five elements identified by Commerce

for a product to meet the exclusion language of a finished heat sink because the

five elements are consistent with the scope exclusion language in the Orders.  The

Court concludes, however, that Commerce's **application** in this case of the five

factors for an excluded finished heat sink is inconsistent with the scope exclusion

language of the Orders and therefore Commerce's determination is not in

accordance with law and not supported by substantial evidence.

In Agilent II, this Court did not clearly sustain Commerce's five-factor test

for determining whether a product qualifies for the finished heat sink exclusion.  In

Agilent II, this Court concluded that Commerce acted unreasonably when it

excluded evidence showing that the plaintiff's product was designed to meet specific thermal performance requirements. 42 CIT at __, 335 F. Supp. 3d at 1354. This Court found that Commerce's determination on this issue lacked substantial evidence. Further, this Court found that the sources Commerce relied upon were insufficient to justify its determination, and this Court concluded that it was "quite unlikely that Commerce [could] confine itself to a limited 19 C.F.R. § 351.225(k)(1) analysis here and reach a supported conclusion for the question of whether Agilent's products are designed and produced around meeting specified thermal requirements." Id. at 1354–55. Ultimately, this Court remanded the matter and directed Commerce to conduct an additional evaluation pursuant to 19 C.F.R. § 351.225(k)(1) and (k)(2) if necessary. Id. at 1355. The matter settled out of court before this Court issued a final judgment.

As will be discussed in more detail below, Commerce's application of this five-factor test in its Final Scope Ruling here was not in accordance with law because Commerce added a new requirement prohibiting a dual purpose of the subject merchandise that the Court concludes is inconsistent with the scope language in the Orders. See Final Scope Ruling at 11–15. This was improper. Commerce's focus should have been on whether Wagner's product satisfied the exclusion language set forth in the Orders, without adding new requirements that do not appear in the scope exclusion language. Further, because Commerce

applied the wrong legal test, its determinations were not supported by substantial evidence.

**I. Fabricated Heat Sink Made from Aluminum Extrusions**

The Orders begin by providing an exclusion for "fabricated heat sinks made from aluminum extrusions." Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654. In its analysis, Commerce relied on the definition of a heat sink set forth in the ITC Final Report. Final Scope Ruling at 11–12. Therein, a heat sink is defined as "a finished good made of extruded aluminum that cools a solid material, principally electronics and computer equipment (servers, laptops, etc.), by transferring the heat generated in such devices to a fluid medium, such as air or a liquid." ITC Final Report at I-10. The ITC Final Report stated that a finished heat sink is "designed to remove the damaging heat from electronic equipment" and heat sinks "are different from most other aluminum extrusions. . . by virtue of the specific and precise tolerances to which they are generally produced." Id. at 10. Finished heat sinks have a flat surface tolerance of "1/1000 of an inch per inch." Id.

Commerce acknowledged that Wagner's product was "CNC machined from an extruded aluminum blank 'with dimensions held to high tolerances and stringent quality standards.'" Final Scope Ruling at 12. Commerce quoted Wagner's description of its product as serving "two main purposes—controlling the flow of

liquid paint and heat dissipation to maintain acceptable temperature of the pump

and motor." Id. In order to do so, Wagner's product operated with a 1/1000 flat

surface tolerance. Commerce determined that "information on the record indicates

that Wagner's part number 805-324 has some of the same functions and features as

a fabricated heat sink, namely that it dissipates heat and has specifications for

flatness that are similar to the flat surface measurements identified by the ITC."

Id. It appears to the Court that based on this evidence and the scope exclusion

language, Commerce should have determined that part 805-324 was "a fabricated

heat sink made from aluminum extrusions."

However, Commerce took issue with the product's capability to serve two

functions. Id. Commerce determined that because Wagner's product both

dissipated heat and controlled the flow of liquid paint, the product could not be

considered a heat sink whose primary purpose was to dissipate heat. Id.

Commerce noted that the ITC Final Report emphasized that the main

distinguishing characteristic of a finished heat sink is that it is "designed to remove

the damaging heat from electronic equipment." Id. at 11–12. The scope exclusion

language does not mention or prohibit a dual purpose of the product, however, and

does not require that a product's primary purpose be heat dissipation in order to

qualify as "a fabricated heat sink made from aluminum extrusions." Commerce's

interpretation is contrary to the Orders' terms and improperly changes the scope of

the Orders. Eckstrom Indus., Inc., 254 F.3d at 1072. Because the scope exclusion language does not require a primary use of heat dissipation, nor does it preclude a dual use, Commerce's determination is not in accordance with law.

Wagner avers that its product meets "all the physical and functional properties of a heat sink" and argues that Commerce's determination was "inconsistent with the plain language of the scope exclusion and the ITC Report." Pl.'s Mot. at 18. The Court agrees that Wagner's product, part number 805-324, meets the description of a fabricated heat sink as set forth in the ITC Final Report and reiterated by Commerce in its Final Scope Ruling. First, Wagner's product is a finished good made of extruded aluminum that dissipates heat. Next, it transfers heat generated within the paint sprayer in accordance with UL 1450 requirements. More specifically, it has a flat surface tolerance of 1/1000 of an inch per inch, which is the exact specification identified in the ITC Final Report as a distinguishing quality of a heat sink.

It appears to the Court that Wagner's product meets the description of a fabricated heat sink as established by the ITC Final Report and the exclusion language of the Orders under the correct legal standard discussed above.

Additionally, Commerce's reliance on Wagner's owner's manual was improper in this case. Commerce focused on Wagner's Titan 440 owner's manual description of part 805-324 as a "pump block" or "pump valve." Final Scope

Ruling at 12.  Commerce determined that "the identification of the part in

Wagner's owner's manual as a pump valve rather than a heat sink, along with

Wagner's description of part number 805-324 as controlling the flow of paint,

suggest that part number 805-324's primary purpose is not that of a heat sink."  Id.

Again, Commerce's determination that a "primary purpose" of heat dissipation is

required is contrary to the scope exclusion language in the Orders, and

Commerce's conclusion that the primary purpose of part 805-324 was not that of a

heat sink was unsupported by substantial evidence.

Moreover, Wagner's owner manual was not before Commerce as a primary

(k)(1) source, and if considered, would be a (k)(2) source.  While Commerce may

consider secondary (k)(2) sources in conducting a (k)(2) analysis (which

Commerce did not do here), if there is a conflict between secondary interpretive

sources and primary interpretive sources, the primary interpretive sources will

normally govern.  19 C.F.R. § 351.255(k)(1)(ii).  Commerce should have given

more weight to "the descriptions of the merchandise contained in the petition

pertaining to the order at issue."  Id. § 351.255(k)(1)(i)(A).  For example, the (k)(1)

sources of the Scope Ruling Request and Wagner's subsequent filings before

Commerce described the product as a heat sink.  Scope Ruling Request at 3–26;

Wagner Rebuttal Comments Scope Ruling Request at 2–9; Wagner's Suppl. Quest.

Resp. at 1–4, 6–7; Wagner Rebuttal Comments Suppl. Quest. at 1–3.  Commerce

did not properly consider this contrary (k)(1) evidence on the record that referred
to Wagner's product as a heat sink, particularly in light of the descriptions in the
petition as a (k)(1) source compared to a contrary (k)(2) source of the owner's
manual.  Commerce did not conduct a (k)(2) analysis and therefore should not
have considered the owner's manual in its (k)(1) analysis.

Commerce's determination that Wagner's product was not a fabricated heat
sink made from aluminum extrusions because it possessed a second function
capability and was identified as a "pump block" and "pump valve" in the owner's
manual was not supported by substantial evidence on the record and otherwise not
in accordance with law.

## II.    Designed, Produced, and Tested Around Specified Thermal Performance Requirements

Next, the Orders require that the "design and production" of the heat sinks
be "organized around meeting certain specified thermal performance requirements"
and be "tested to comply with such requirements."  Antidumping Duty Order, 76
Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654.
Throughout this proceeding, the Parties have disputed the proper interpretation of
"specified thermal performance requirements."  Scope Ruling Request at 17,
19–22; Def.-Interv.'s Comments Wagner's Scope Ruling Request at 6–13; Suppl.
Quest. at 4; Wagner's Suppl. Quest. Resp. at 1–7; Def.-Interv.'s Comments

Wagner Suppl. Quest. Resp.; Pl.'s Br. at 21–25; Def.'s Br. at 20–23; Pl.'s Reply at 5–8. Because the interpretation of sufficient thermal requirements affects the analysis of the product's design, production, and testing, the Court will address the issue of specified thermal performance requirements first.

**A. Specified Thermal Performance Requirements**

Commerce relied on the ITC Final Report for guidance on its analysis of whether Wagner's product was designed, produced, and tested around certain specified thermal performance requirements. Final Scope Ruling at 12–15. The ITC Final Report emphasized that the main distinguishing characteristic of a finished heat sink is its "customized thermal resistance properties." ITC Final Report at 7. The ITC Final Report noted that finished heat sinks "are certified to perform within thermal resistance parameters." Id. Lastly, the ITC Final Report described finished heat sinks as "precisely or optimally suited to cool the specific electronic devices for which they have been designed." Id.

Commerce acknowledged that Wagner's product was designed to meet the thermal resistance properties established in UL 1450. Final Scope Ruling at 13. UL 1450 "is the 'standard for safety' for motor-operated air compressors, vacuum pumps, and painting equipment." Id. UL 1450 governs the temperature restrictions for Wagner's paint sprayer as a whole, as well as certain components,

such as the PC board and motor.  Id.  Commerce discussed the individual

temperature requirements for Wagner's paint sprayer, the PC board, and motor.  Id.

Although specified thermal performance requirements existed, Commerce

determined that Wagner failed to satisfy this element because the UL 1450

temperature requirements pertained to a downstream product and the downstream

product's components.  Id.  Commerce determined "that the thermal performance

of part number 805-324 being 'tied to' the operating temperature standards for the

downstream product is not sufficient to meet the specific requirements of the

finished heat sink scope exclusion, which requires that specified thermal

performance requirements must exist for the inquiry merchandise."  Id.

Defendant and Defendant-Intervenor contend that, to qualify for an

exclusion, a finished heat sink must have its own thermal performance

requirements, separate and independent from any thermal performance

requirements of any downstream product.  Def.'s Resp. at 21–23; Def.-Interv.'s

Resp. at 1.

In its Final Scope Ruling, Commerce provided no citations to support its

determination "that the thermal performance of part number 805-324 being 'tied

to' the operating temperature standards for the downstream product [wa]s not

sufficient to meet the specific requirements of the finished heat sink scope

exclusion, which requires that specified thermal performance requirements must

exist for the inquiry merchandise." Final Scope Ruling at 13. The scope exclusion

language does not mention downstream products and does not prohibit the thermal

performance requirements from being tied to a downstream product; the exclusion

language merely states that "the design and production of which are organized

around meeting certain specified thermal performance requirements."

Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76

Fed. Reg. at 30,654. Commerce's determination on this issue is contrary to the

Orders' terms and impermissibly changes the scope of the Orders. Eckstrom

Indus., Inc., 254 F.3d at 1072. The scope exclusion language merely requires that

the "design and production" of the fabricated heat sink "are organized around

meeting certain specified thermal performance requirements." Antidumping Duty

Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654.

The Court's interpretation based on the actual scope language is broader than the

interpretation proposed by Commerce.

It appears to the Court that Wagner's painting equipment product was

designed to meet the thermal resistance properties established in UL 1450 (as

noted by Commerce, Final Scope Ruling at 13), and thus part 805-324 is a

fabricated heat sink that was designed, produced, and tested around certain

specified thermal performance requirements pursuant to the scope exclusion

language of the Orders.

On remand, Commerce must reconsider the basis for its determination that the thermal resistance properties of heat sinks are separate from downstream products. Commerce must also reconsider on remand its determinations regarding the certifications applicable to Wagner's products. Commerce acknowledged that Wagner's product was designed to meet the thermal resistance properties established in UL 1450. Final Scope Ruling at 13. Commerce should reconsider or explain why UL 1450 is not a certification within the context of the finished heat sink exclusion provision.

The Court observes that the ITC Final Report and Commerce's prior scope rulings discuss the thermal resistance properties of finished heat sinks, and the ITC Final Report mentioned the expectation that the thermal resistance properties will relate to downstream products. ITC Final Report at 7–8 ("The principal end-use applications of aluminum extrusions are in the building and construction, transportation, and engineered products sectors. [Finished heat sinks] have a specific end use (thermal management of electronic devices), but many other aluminum extrusions also have distinct individual end-use applications.").

The ITC Final Report noted that while "these thermal resistance properties are not visible, they are clearly relevant to the customers for whom [finished heat sinks] have been designed." Id. The ITC Final Report explained that finished heat sinks are "precisely or optimally suited to cool the specific electronic devices for

which they have been designed." Id.  At no point did the ITC state that the

finished heat sinks themselves must operate independently within a specified

range.  The context of this requirement implies that the thermal resistance

properties are instead directly related to "the specific electronic devices for which

they have been designed." Id.  The ITC Final Report described the thermal

resistance properties of heat sinks entirely in the context of the downstream

products for which they were designed.  In light of this potentially contrary

evidence, Commerce on remand must reconsider its determination.

This Court faced similar questions in Agilent II, 42 CIT at __, 335 F. Supp.

3d at 1354–55.  In Agilent II, both parties debated at length the meaning of the

phrase "specified thermal performance requirements." Id. at __, 335 F. Supp. 3d at

1354.  Not only did the parties differ in their interpretation of how this element

may be met, but it also was unclear how the industry viewed "specified thermal

performance requirements." Id. at __, 335 F. Supp. 3d at 1355.  In Agilent II, this

Court left unanswered the question "What are specified thermal performance

requirements?" Id.  This question remained unresolved as the parties in Agilent II

settled the litigation before the Court issued a final judgment.  The Court does not

answer this question here either.

The Court concludes that Commerce's determination regarding the specified thermal performance of finished heat sinks is not in accordance with law and not supported by substantial evidence.

### B. Designed, Produced, and Tested Around Specified Thermal Performance Requirements

The scope exclusion language of the Orders requires that the product be designed, produced, and tested, in accordance with the specified thermal performance requirements. Commerce determined that Wagner failed to meet the design, production, and testing criteria in large part because Wagner failed to show that specified thermal performance requirements existed for the product to have been designed, produced, and tested to satisfy. For each of these three processes, Commerce discussed the record evidence that Wagner submitted detailing its design, production, and testing processes. Final Scope Ruling at 13–15. Commerce discounted all this evidence based on its earlier determination that no specified thermal performance requirements existed for Wagner's product. Id.

In its analysis of the product's design, Commerce explained that "because Wagner has not demonstrated that specified thermal performance requirements exist, as explained above, we f[ound] that it also has not demonstrated that part number 805-324's design was organized around meeting those specified thermal performance requirements." Id. at 14. Nevertheless, Commerce summarized the steps in Wagner's design process that related to part number 805-324's capability

to operate in accordance with the temperature requirements specified in UL 1450.

Id. at 13–14.  Commerce also noted that Wagner did not identify "the types of

specialized equipment that the ITC described as being involved in the design of

finished heat sinks, including wind tunnels, flow calibration equipment, or

specialized design and data collection software."  Id. at 14.

However, the Court agrees with Plaintiff that these methods of design are

not meant to be an exclusive list.  The ITC Final Report also stated that "[h]eat

sinks may be designed and tested for thermal performance, including using

sophisticated computer modeling software, wind tunnels, and other apparatus."

ITC Final Report at 31.  The ITC Final Report did not mandate that these methods

were the only design and testing methods that were sufficient.

Commerce noted that Wagner described in detail its design process and the

specialized equipment used in its supplemental questionnaire, such as a test bench

with controlled variables using calibrated test equipment such as thermocouples

and electrical diagnostic apparatus and equipment.  Final Scope Ruling at 13–14

(citing Wagner Suppl. Quest. Resp. at 2).  Because the Court already found that

Commerce improperly determined that Wagner failed to demonstrate that specified

thermal performance requirements exist, and now finds that Wagner provided

contrary evidence demonstrating that part 805-324 was designed to meet specified

thermal requirements, the Court concludes that Commerce's determination that

Wagner failed to show its heat sink was not designed around specified thermal

performance requirements was unsupported by substantial evidence and not in

accordance with law.

Similarly, when Commerce analyzed the production of Wagner's finished

heat sink, it determined that "because Wagner has not demonstrated that specified

thermal performance requirements exist, as explained above, we f[ound] that it also

has not demonstrated that part number 805-324's production was organized around

meeting those specified thermal performance requirements." Id. at 14.  Commerce

also noted that Wagner did not identify "the types of specialized equipment that the

ITC described as being involved in the production of finished heat sinks, including

wind tunnels, flow calibration equipment, or specialized design and data collection

software." Id.

In terms of production, the ITC Final Report referred to production of

prototypes, which is not relevant here.  ITC Final Report at 8.  In its response to

Commerce's supplemental questionnaire, Wagner explained that "the key physical

characteristic of the heat sink manifold that permits it to achieve the necessary

thermal parameters is the flat surface tolerance," which is produced through CNC

machining.  Wagner's Suppl. Quest. Resp. at 6.  Because the Court already found

that Commerce improperly determined that Wagner failed to demonstrate that

specified thermal performance requirements exist, and now finds that Wagner

provided record evidence that part 805-324 was produced to achieve specific thermal controls, the Court concludes that Commerce's determination that Wagner failed to show that part 805-324 was produced in accordance with specified thermal performance requirements was not in accordance with law and unsupported by substantial evidence.

Lastly, when analyzing Wagner's testing of its product, Commerce explained that "because Wagner has not demonstrated that specified thermal performance requirements exist, as explained above, we f[ound] that it also has not demonstrated that part number 805-324 has been fully tested to comply with those specified thermal performance requirements." Final Scope Ruling at 15. Commerce acknowledged that Wagner provided evidence of testing the thermal properties of the downstream paint sprayer and its individual components, but Commerce determined that Wagner failed to demonstrate that "part number 805-324 has been tested to comply with the specified thermal performance requirements." Id.

In support of Commerce's determination, the Government cites to the Agilent proceedings and avers that the mass filter radiator product in Agilent was tested independently from its downstream product. Def.'s Resp. at 29. Neither the final scope ruling in the Agilent proceedings nor this Court's opinion in Agilent I state that the product was independently tested. In Agilent II, this Court explained

that many questions were left open-ended. Agilent II, 42 CIT at __, 335 F. Supp.

3d at 1355. The Government's reliance on the Agilent proceedings as a source of

support for separate, individualized testing of heat sinks is misplaced. As

discussed above, because the Court already found that Commerce improperly

determined that Wagner failed to demonstrate that specified thermal performance

requirements existed for its product, and because the Court now finds that contrary

record evidence exists showing that part 805-324 was tested to comply with such

thermal requirements, the Court concludes that Commerce's determination that

Wagner failed to show that part 805-324 was tested to comply with specified

thermal performance requirements was not in accordance with law and was

unsupported by substantial evidence.

## CONCLUSION

For the reasons set forth above, the Court holds that Commerce's Final

Scope Ruling was not in accordance with law and was not supported by substantial

evidence. Therefore, the Court remands the Final Scope Ruling for reconsideration

pursuant to this Opinion. It is further

**ORDERED** that that this case shall proceed according to the following

schedule:

(1)    Commerce shall file its remand determination on or before June 16, 2025;

(2)    Commerce shall file the administrative record on or before June 30, 2025;

(3) Comments in opposition to the remand determination shall be filed on or before July 30, 2025;

(4) Comments in support of the remand determination shall be filed on or before August 29, 2025; and

(5) The joint appendix shall be filed on or before August 29, 2025.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated: April 21, 2025
New York, New York